**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

In re RTI Surgical Derivative Litigation

Case No. 1:20-cv-03347

REDACTED - PUBLIC VERSION

**<u>VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

# TABLE OF CONTENTS

Page

I.  NATURE AND SUMMARY OF THE ACTION ................................................................. 1

II. JURISDICTION AND VENUE ................................................................................. 4

III. PARTIES ................................................................................................................ 4

    Plaintiffs ................................................................................................................ 4

    Nominal Defendant ................................................................................................ 5

    Defendants ............................................................................................................. 5

    Non-Party Directors .............................................................................................. 9

IV. DUTIES OF THE INDIVIDUAL DEFENDANTS ................................................. 9

    A.    Fiduciary Duties ....................................................................................... 9

    B.    Code of Conduct ..................................................................................... 10

    C.    Code of Ethics for Senior Financial Officers ........................................ 11

V.  SUBSTANTIVE ALLEGATIONS ........................................................................ 13

    A.    Background ............................................................................................. 13

            1.    Overview of the Company ......................................................... 13

            2.    Relevant Accounting Policies ................................................... 14

    B.    ██████████████████████████████████

            ████████████████ ...................................................... 15

    C.    The Individual Defendants Caused RTI to Issue Materially Misleading
        Statements .............................................................................................. 25

    D.    The Truth Begins to Emerge ................................................................. 57

            1.    RTI Reveals That Certain OEM Contracts Were Improperly
                 Recorded ................................................................................... 57

            2.    RTI Restates its Financial Statements and Reports Material
                 Weaknesses in its Internal Controls Over Financial Reporting ................ 60

i

      3.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

           ▮▮▮▮▮▮▮ ...................................................................71

E.     The Director Defendants Caused the Company to Expend Significant
Funds to Repurchase Its Stock ...................................................................78

F.     Defendant Singer Sold Nearly $45,000 in RTI Stock While in
Possession of Material Non-Public Information .......................................80

G.    The Motion to Dismiss in the Securities Class Action Was Denied ....................80

VI.  DAMAGES TO THE COMPANY .................................................................81

COUNT I ....................................................................................................87

COUNT II ...................................................................................................88

COUNT III ..................................................................................................88

COUNT IV ..................................................................................................90

COUNT V ...................................................................................................92

COUNT VI ..................................................................................................93

COUNT VII .................................................................................................94

PRAYER FOR RELIEF ...............................................................................94

JURY DEMAND ..........................................................................................96

Plaintiffs Niall Campbell, Dave Summers, and Dominick De Filippis (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant, RTI Surgical Holdings, Inc. n/k/a Surgalign Holdings, Inc. ("RTI" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and certain of its current and former executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (*i.e.*, *Brophy* claim), violations of Section 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), waste of corporate assets, and unjust enrichment. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel based on, among other things: (a) a review of publicly available information, including filings by RTI with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record; (b) documents and information obtained pursuant to 8 Del. C. § 220 ("Section 220"); and the record in the related securities class action pending before this Court, , *Lowry v. RTI Surgical Holdings, Inc., et al.*, 1:20-cv-01939 (the "Securities Class Action").

I.      **NATURE AND SUMMARY OF THE ACTION**

1.      RTI is a global surgical implant company that provides surgeons with safe biologic, metal, and synthetic implants, which are used in sports medicine, general surgery, spine, orthopedic, and trauma procedures.

2.      For fiscal years 2015 through 2018, RTI reported strong results and a consistent revenue recognition policy and affirmed the effectiveness of its internal control over financial reporting. On March 8, 2019, RTI Surgical Inc. acquired Paradigm Spine, LLC ("Paradigm") and reorganized as RTI Surgical Holdings, Inc., the successor reporting company.

3.      Then, on January 13, 2020, the Company announced that it had reached an agreement to sell its original equipment manufacturer ("OEM") business for $490 million to Montagu Private Equity LLP ("Montagu"), subject to closing conditions and shareholder approval.

4.      On March 16, 2020, after the market closed, RTI disclosed that it could not timely file its annual report on Form 10-K for fiscal 2019 due to ongoing investigations by the SEC and the Audit Committee regarding revenue recognition. Specifically, the investigation concerned the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers.

5.      On this news, RTI's stock price fell $0.40 per share, nearly 15%, to close at $2.35 per share on March 17, 2020, on unusually heavy trading volume.

6.      Days later, the Company disclosed that, due to the failure to timely file a proxy statement with the SEC, RTI was in breach of the agreement with Montagu to sell the OEM business.

7.      On April 9, 2020, the Company revealed that financial statements for fiscal years 2014 through 2018 should no longer be relied upon and would be restated. RTI disclosed that "goods were delivered early without obtaining the customers' affirmative approval," thus leading to improper revenue recognition, and that improper adjustments had been made for product returns.

8.      On April 29, 2020, the Company announced certain amendments to its agreement to sell the OEM business, including, among other things, a $50 million reduction in the purchase price.

9.      On June 8, 2020, RTI filed its restated financial statements for the previously disclosed periods, impacting various line items including revenue, operating expenses, accounts receivable, inventories, and accounts payable. RTI also identified material weaknesses, including

that "the tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting" and that "the Company's formal SOX compliance program did not have sufficient scope and focus on the key financial reporting risks."

10.    The same day, the Company filed its belated 2019 annual report, which restated certain financial items that were previously reported in quarterly reports for fiscal 2019.  It further identified "errors [that] were made in connection with the recording of the acquisition of Paradigm Spine, LLC in 2019."

11.    Moreover, while the material information regarding revenue recognition with respect to OEM customers remained non-public, RTI spent an aggregate $4.5 million to repurchase approximately 1,006,318 shares of its own common stock at artificially inflated prices.  As the Company's stock was actually worth only $2.35, the price at the close of market on March 17, 2020, the Company overpaid for the purchases of its own stock by approximately $2.1 million.

12.    On March 16, 2021,  RTI filed its annual report for fiscal year 2020, admitting that the material weaknesses leading to the restatement had not been remediated. According to the report "[r]emediation of the identified material weaknesses and strengthening our internal control environment will require a substantial effort throughout 2021."

13.    These revelations precipitated the filing of the Securities Class Action in the U.S. District Court for the Northern District of Illinois against RTI and certain of its officers.

14.    On April 1, 2021, U.S. District Judge Matthew F. Kennelly issued an order in the Securities Class Action denying defendants' motion to dismiss.  In the order, Judge Kennelly held that a claim for securities fraud had been stated against RTI and certain of its officers.  It is now a virtual certainty that RTI will incur significant liability due to the fiduciary breaches committed by defendants when they issued misleading statements about the Company's financial results.

15.     Plaintiffs did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  When this action was filed, the Board was composed of ten directors, eight of whom are named in this action.  As alleged herein, at least eight directors knew the disclosures with respect to RTI's revenue recognition and the effectiveness of its internal controls were incomplete or inaccurate, yet allowed misleading statements to be disseminated.  Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

II.     **JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) and 10(b) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

III.    **PARTIES**

**Plaintiffs**

18.     Niall Campbell purchased 15 shares of RTI stock in June 2012 and has continuously owned his RTI stock since that date.

19.     Dave Summers purchased 500 shares of RTI stock in July 2017 and has continuously owned his RTI stock since that date.

20.     Dominick De Filippis purchased 500 shares of RTI stock in June 2015 and has continuously owned his RTI stock since that date.

**Nominal Defendant**

21.     RTI is a Delaware corporation with its principal executive offices located at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015.  The Company stock trades on the NASDAQ stock exchange under the symbol "RTIX."

**Defendants**

22.     Camille I. Farhat ("Farhat") has served as RTI's Chief Executive Officer ("CEO"), President and a director from March 2017 to July 2020.  Farhat is named as a defendant in the Securities Class Action.  For the fiscal year ended December 31, 2018, Farhat received $1,219,629 in compensation from RTI: $651,119 in salary, $550,383 in non-equity incentive plan compensation, and $18,127 in all other compensation.  For the fiscal year ended December 31, 2019, he received $690,184 in compensation from RTI: $664,148 in salary and $26,036 in all other compensation.

23.     Brian K. Hutchison ("Hutchison") served as RTI's CEO and President from December 2001 to December 2016.  Hutchison is named as a defendant in the Securities Class Action.  For the fiscal year ended December 31, 2016, Hutchison received $1,388,802 in compensation from RTI: $590,796 in salary, $600,000 in stock awards, $150,000 in option awards, $25,150 in nonqualified deferred compensation earnings, and $22,856 in all other compensation.

24.     Jonathon M. Singer ("Singer") has served as RTI's Chief Financial and Administrative Officer ("CFAO") since September 2017 and as Corporate Secretary since November 2017.  On January 10, 2020, Singer was promoted to serve as Chief Operating Officer ("COO"), contingent and effective upon the Company's proposed sale of its OEM business.  He served as a director of RTI from May 2016 to September 2017.  Singer is named as a defendant in

the Securities Class Action. For the fiscal year ended December 31, 2018, Singer received $2,188,311 in compensation from RTI: $450,000 in salary, $1 million bonus, $247,350 in stock awards, $247,487 in option awards, $223,763 in non-equity incentive plan compensation, and $19,711 in all other compensation. For the fiscal year ended December 31, 2019, Singer received $1,003,652 in compensation from RTI: $460,347 in salary, $514,798 in stock awards, and $28,507 in all other compensation.

25.     Robert P. Jordheim ("Jordheim") served as the Company's Chief Financial Officer ("CFO") and Executive Vice President from June 2010 to December 16, 2016 and from March 15, 2017 to October 31, 2017. He also served as interim President and CEO from December 16, 2016 to March 15, 2017. Jordheim is named as a defendant in the Securities Class Action. For the fiscal year ended December 31, 2017, Jordheim received $1,009,489 in compensation from RTI: $335,499 in salary, $53,920 in bonus, $140,000 in stock awards, $140,099 in option awards, and $339,972 in all other compensation.

26.     Johannes W. Louw ("Louw") served as the Company's Vice President of Financial Planning and Analysis from September 2018 to April 2020, when he was terminated from the Company. Louw served as interim CFO from December 2016 to March 2017. On January 10, 2020, he was promoted to CFO, contingent and effective upon the Company's proposed sale of its OEM business. After joining RTI in June 2003, he served in various roles, including interim CFO and Vice President of Finance and Corporate Controller. Louw is named as a defendant in the Securities Class Action. For the fiscal year ended December 31, 2018, Louw received $460,132 in compensation from RTI: $236,187 in salary, $64,525 in stock awards, $64,636 in option awards, $72,807 in non-equity incentive plan compensation, and $319 in all other compensation.

27.     Peter F. Gearen ("Gearen") served as a director of the Company from 1998 to March 2019.  He served as Vice Chairman of the Board from February 2016 to March 2019.  For the fiscal year ended December 31, 2018, Gearen received $130,000 in compensation from the Company, including $55,000 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31, 2019, Gearen received $35,179 in compensation from RTI, consisting entirely of fees earned or paid in cash.

28.     Thomas A. McEachin ("McEachin") has served as a director of the Company since December 2015.  He is Chair of the Audit Committee.  For the fiscal year ended December 31, 2018, McEachin received $135,000 in compensation from the Company, including $60,000 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31, 2019, McEachin received $167,500 in compensation from the Company, including $67,500 in fees earned or paid in cash and $100,000 in stock awards.

29.     Curtis M. Selquist ("Selquist") served as a director of the Company from July 2013 to July 2020 and as Chairman of the Board from February 2016 to July 2020.  For the fiscal year ended December 31, 2018, Selquist received $175,000 in compensation from RTI, including $100,000 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31, 2019, he received $207,500 in compensation from RTI, including $107,500 in fees earned or paid in cash and $100,000 in stock awards.

30.     Mark D. Stolper ("Stolper") has served as a director of the Company since March 2017.  He is a member of the Audit and Compensation Committees.  For the fiscal year ended December 31, 2018, Stolper received $132,500 in compensation from RTI, including $57,500 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31,

2019, he received $165,000 in compensation from RTI, including $65,000 in fees earned or paid in cash and $100,000 in stock awards.

31.     Christopher R. Sweeney ("Sweeney") served as a director of the Company from October 2015 to July 2020.  For the fiscal year ended December 31, 2018, Sweeney received $115,000 in compensation from RTI, including $40,000 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31, 2019, he received $147,500 in compensation from RTI, including $47,500 in fees earned or paid in cash and $100,000 in stock awards.

32.     Paul G. Thomas ("Thomas") has served as a director of the Company since June 2016.  He is a member of the Compensation Committee.  For the fiscal year ended December 31, 2018, Thomas received $128,131 in compensation from RTI, including $53,131 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31, 2019, he received $162,898 in compensation from RTI, including $62,898 in fees earned or paid in cash and $100,000 in stock awards.

33.     Nicholas J. Valeriani ("Valeriani") has served as a director of the Company since June 2016.  He is a member of the Compensation Committee.  For the fiscal year ended December 31, 2018, Valeriani received $127,500 in compensation from RTI, including $52,500 in fees earned or paid in cash and $75,000 in stock awards.  For the fiscal year ended December 31, 2019, he received $160,000 in compensation from RTI, including $60,000 in fees earned or paid in cash and $100,000 in stock awards.

34.     Shirley A. Weis ("Weis") served as a director of the Company from October 2014 to May 2021.  She served as a member of the Audit Committee until 2019.  For the fiscal year ended December 31, 2018, Weis received $142,913 in compensation from RTI, including $67,913

in fees earned or paid in cash and $75,000 in stock awards. For the fiscal year ended December 31, 2019, she received $168,297 in compensation from RTI, including $68,297 in fees earned or paid in cash and $100,000 in stock awards.

35. Farhat, Hutchison, Singer, Jordheim, Louw, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis are sometimes referred to hereinafter as the "Individual Defendants." Defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis are sometimes referred to hereinafter as the "Director Defendants."

**Non-Party Directors**

36. Jeffrey C. Lightcap ("Lightcap") has served as a director of the Company since March 8, 2019.

37. Stuart F. Simpson ("Simpson") has served as a director of the Company since June 1, 2020.

IV. **DUTIES OF THE INDIVIDUAL DEFENDANTS**

    A.   **Fiduciary Duties**

38. By reason of their positions as officers, directors, and/or fiduciaries of RTI and because of their ability to control the business and corporate affairs of RTI, at all relevant times, the Individual Defendants owed RTI and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage RTI in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of RTI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to RTI and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of RTI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with RTI, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

40.    To discharge their duties, the officers and directors of RTI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of RTI were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

B.    **Code of Conduct**

41.    RTI has a Code of Conduct, which requires the Company's officers, directors and employees to adhere to "principles and standards of business conduct . . . to avoid even the appearance of improper behavior."

42.    The Code of Conduct provides that each employee must "[p]rovide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files

with or submits to the Securities and Exchange Commission and in other public communications made by the Company."

43.     The Code of Conduct further provides that each employee must "[r]ecognize and report possible violations of this Code, as well as all policies, guidelines, applicable laws and regulatory requirements under which the Company operates."

44.     The Code of Conduct also provides that RTI is committed to "offer only those products and services that we can deliver and strive to meet or exceed the commitments that we made. We compete fairly, engaging only in legal and ethical practice. Lastly, we meet our contractual obligations by reporting information accurately and charging honestly for our products and services."

45.     In a section titled, "Securities Trading & Insider Information," the Code of Conduct states that:

> Company policy forbids unauthorized disclosure of material non-public information about the Company or the companies it deals with, and both Company policy and the law forbid profiting from material non- public information relating to the Company or the companies with whom we do business. Material information includes any information that a reasonable investor is likely to consider important in determining whether to buy, sell or hold the Company's stock.

C.     **Code of Ethics for Senior Financial Officers**

46.     The Code of Conduct also requires "senior executive officers and those responsible for our financial reporting" to adhere to "the Code of Ethics for Senior Financial Officers which imposes strict obligations on them to take careful steps to assure that the Company properly tracks and reports our financial performance."

47.     The Code of Ethics for Senior Financial Officers (the "Code of Ethics") aims to ensure "proper disclosure of financial information in filings with, or submissions to, the Securities and Exchange Commission and to deter wrongdoing."  The Code of Ethics is "applicable to the

Company's Chief Executive Officer, President, Chief Financial Officer, Director of Finance/Controller and other senior financial professional performing similar functions ('Senior Financial Professionals')."  The Code of Ethics "is intended to supplement the [Code of Conduct] that is applicable to all employees and directors of the Company."

48.     In addition to promoting "a culture of honesty, integrity, ethical behavior and accountability," Senior Financial Professionals must maintain accurate records.  Specifically, the Code of Ethics states, in relevant part:

> Senior Financial Professionals shall maintain all Company accounting records and reports derived from Company accounting records in accordance with applicable laws, in a manner that fairly and accurately reflects the transactions or occurrences to which they relate and ensures that the Company accounting records fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses and do not contain any false or intentionally misleading entries. In this regard, compliance with the Company's system of internal controls is required at all times.

49.     Moreover, under the heading "Disclosure in SEC Filings and Other Public Communications," the Code of Ethics states that:

> Senior Financial Professionals shall conduct themselves in a manner that promotes the full, fair, accurate, timely and understandable disclosure of all material information required to be included in: (1) each report or other document the Company files with, or submits to, the SEC and (2) in all other public communications made by the Company. To this end, the Senior Financial Professionals will establish and apply the Company's internal controls and disclosure controls and procedures in a manner that will enable the Company's financial statements to present fairly, in all material respects, the financial position, results of operations and cash flows of the Company.

50.     In a section titled "Compliance with Applicable Laws, Rules and Regulations," the Code of Ethics states that:

> The Senior Financial Professionals shall conduct themselves, and shall encourage all employees to conduct themselves, to ensure and facilitate compliance by the Company with the laws, rules and regulations applicable to its business. To this end, they are charged with overseeing the Company's various programs and policies concerning: (1) the "Whistleblower Protection" provisions of the Sarbanes-

Oxley Act and similar laws applicable to the Company and (2) identifying and promptly reporting to the Audit Committee and correcting any material deviation from applicable laws, rules and regulations and Company policies.

51.     The Code of Ethics further provides that "Senior Financial Professionals are required to report to the Audit Committee any known or suspected violation of this Code by any Senior Financial Professional."

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

#### 1.     Overview of the Company

52.     RTI is a global surgical implant company that provides surgeons with safe biologic, metal, and synthetic implants, which are used in sports medicine, general surgery, spine, orthopedic, and trauma procedures.

53.     On March 8, 2019, RTI Surgical, Inc. acquired Paradigm, a motion preservation and non-fusion spinal implant technology company, and reorganized as RTI Surgical Holdings, Inc.  Thereafter, RTI Surgical, Inc. became a wholly owned subsidiary of RTI Surgical Holdings, Inc., the successor reporting company.

54.     Prior to the fourth quarter of 2019, RTI operated as one reporting segment comprised of four franchise lines: spine, sports, OEM, and international.  OEM, which accounts for the largest percentage of the Company's total revenues, focuses on the design, development, and manufacture of biologic, metal, and synthetic implants for medical technology companies. During the fiscal year ended December 31, 2018, OEM accounted for 43% of RTI's total revenues. In the fourth quarter of 2019, the Company reorganized to operate under two operating segments: Global Spine and Global OEM. The Global Spine segment focuses on sales, distribution, and research and development activities for the global spine market, whereas the Global OEM segment

focuses on the design, development, and manufacturing of biologics and hardware medical technology.

55.     Despite reporting record results for the OEM business in second quarter 2019, the Company announced on January 13, 2020 that it had agreed to sell its OEM Business to Montagu, a private European equity firm, for $490 million.  Following the sale, RTI would become a "Global Pure Play Spine Company."   The transaction was unanimously approved by RTI's Board and subject to shareholder approval.  According to the press release announcing the transaction, the sale "complete[d] the first phase of [RTI's] strategic transformation to reduce complexity, drive operational excellence and accelerate the growth of RTI."

2.     **Relevant Accounting Policies**

56.     Companies are required to report their financial results in accordance with generally accepted accounting principles ("GAAP"), which are the conventions, rules, and procedures promulgated by the Financial Accounting Standards Board ("FASB").  Financial statements filed with the SEC that are not in compliance with GAAP are presumed to be misleading and inaccurate. *See* SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

57.     Pursuant to Accounting Standards Codification ("ASC") 250, *Accounting Changes and Error Corrections*, an entity must issue a restatement to correct an error in previously issued financial statements.  Specifically:[1]

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or ***oversight or misuse of facts that existed at the time the financial statements were prepared.*** A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

B.  ███████████████████████████████████████████
    ████████████████████

58.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

59.  ████████████████████████████████████████

███████████████████████████████████████   ████████

██████████████████████████████████

60.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

61.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

62.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

63. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

64. ████████████████████████████████████████

████████████████████████████████████████████████

█████

65. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

        ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

66. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ ███████████████████████

███████████████████████████████████████████████████

██████

67. ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ ████████████████

███████████████████████████████████████████████████

██████████████████████████ ██████████████████████

███████████████████████████████████████████

68. ████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

■ ██████████████████████████████████
█████████████████████████████████████

■ ██████████████████████████████████
████████████

■ ██████████████████████████████████
█████████████

■ ██████████████████████████████████
█████████████████████

69. ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

70. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████  ██████████████

████████████████████████████████

████████████████████████████████████████
████████████████

████████████████████████████████████████
████████████████████████

████████████████████████████
██████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

71. ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

72. ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

73. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

74. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████    ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

   ▪ ████████████████████████████████████
     ████████████████████████

   ▪ ████████████████████████████████████
     ██████████████████████████

        ▪ ██████████████████████████████
          ████████████████████

   ▪ ████████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████
     ████████████

75. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

76. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

77.    ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████  ██████████████

████████████████████████████████

78.    ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████  ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

79.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  ██████████████████████████████████████████████

██████████████████████████████████████

80.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

81.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

82.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  ██████████████████████████████████████

██████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

83.  ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

84.  ████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████

85.  ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

86.  ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████

█   █   █



90. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████

91. ███████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

92. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████   ███████
███████████████████████████████████████

93. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████

94. ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████

95. ███████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████████

███████████

96.  ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

C.    **The Individual Defendants Caused RTI to Issue Materially Misleading Statements**

97.    On March 7, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, and Weis caused RTI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2015 (the "2015 10-K"). The report was signed by defendants Hutchison, Jordheim, Selquist, Gearen, McEachin, Sweeney, and Weis, and non-parties Dean H. Bergy, Philip R. Chapman, and Adrian J.R. Smith. Regarding RTI's policy for revenue recognition, the 2015 10-K stated, in relevant part:

> *Revenue Recognition—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.*
>
> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. *Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.*
>
> *The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized.* Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

98.     The 2015 10-K reported that "total revenues increased $19.5 million, or 7.4%, to $282.3 million for the year ended December 31, 2015 compared to $262.8 million for the year ended December 31, 2014."  The year-over-year increase was purportedly "impacted due to a significant amount of [RTI's] revenue being derived from large commercial stocking distributors, whose timing of orders can vary from year to year."

99.     The 2015 10-K stated that RTI's "management believes that, as of December 31, 2015, the Company's internal control over financial reporting is effective."  Moreover, the 2015 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Hutchison and Jordheim, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

100.    The statements in the 2015 10-K were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

101.    On April 28, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, and Weis caused RTI to issue a press release announcing its first quarter 2016 financial results, stating in relevant part:

*Worldwide revenues were $67.4 million for the first quarter of 2016 compared to revenues of $68.0 million for the first quarter of 2015. For* the first quarter of 2015, the company benefited from $1.5 million in non-recurring accelerated deferred revenue recognition due to loss of exclusivity by its commercial distributor in the breast reconstruction market. *Domestic revenues were $61.2 million for the first quarter of 2016 compared to revenues of $62.7 million for the first quarter of 2015. International revenues were $6.2 million for the first quarter of 2016*, compared to revenues of $5.3 million for the first quarter of 2015. On a constant currency basis, international revenues for the first quarter of 2016 increased 18 percent compared to the first quarter of 2015.

102.    The statements in ¶ 101 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

103.    On April 28, 2016, the Company held a conference call to discuss the first quarter 2016 financial results with analysts and investors.  During the call, Hutchison stated that "we've seen revenue from our commercial business ebb and flow from year-to-year, but trending to growth long-term. In fact, from 2005 through today, our commercial business has achieved compound average annual growth rate of 7%."

104.    The statements in ¶ 103 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue

from a future quarter; and (3) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

105.    On May 4, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, and Weis caused RTI to file its quarterly report on Form 10-Q for the period ended March 31, 2016 (the "1Q16 10-Q"). It was signed by defendants Hutchison and Jordheim. It stated, in relevant part: "Our total revenues decreased by $683,000, or 1.0%, to $67.4 million for the three months ended March 31, 2016 compared to $68.0 million for the three months ended March 31, 2015." It also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

106.    The statements in ¶ 105 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

107.    On July 27, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, and Weis caused RTI to issue a press release announcing its second quarter 2016 financial results, stating in relevant part:

> *Worldwide revenues were $67.6 million for the second quarter of 2016 compared to revenues of $71.6 million for the second quarter of 2015. Domestic revenues were $61 million for the second quarter of 2016 compared to revenues of $66 million for the second quarter of 2015.* International revenues were $6.6 million

for the second quarter of 2016, compared to revenues of $5.6 million for the second quarter of 2015. On a constant currency basis, international revenues for the second quarter of 2016 increased 16 percent compared to the second quarter of 2015.

108.    On July 27, 2016, RTI held a conference call to discuss the second quarter 2016 financial results with analysts and investors.  During the call, defendant Jordheim stated that "[g]lobal commercial revenue of $24.8 million for the second quarter of 2016 decreased 27% compared to the second quarter of 2015, due to lower orders from certain commercial distributors primarily in the spine, trauma, and dental markets."  An analyst clarified, "[r]egarding the commercial business, is it one partner that you're having some issues with, or is it a couple of them?"  Defendant Jordheim replied:

> It's actually – it's primarily one partner. It's our commercial distributor in the trauma and dental businesses. With the major acquisitions made last year by this particular commercial partner, the 2015 inventory balance, *they've ordered a lot of product from us in an anticipation of our sell-through opportunities or crossselling opportunities. Those cross-selling opportunities have been slower than expected to materialize. So net-net in 2015, the orders were higher than they probably should have been* and we're feeling the impact of that in 2016.

109.    The above statements on July 27, 2016 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

110.    On August 4, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q for the period

ended June 30, 2016 (the "2Q16 10-Q"). It was signed by defendants Hutchison and Jordheim.

Regarding revenues, the 2Q16 10-Q stated, in relevant part:

> ***Our total revenues decreased by $4.0 million, or 5.6%, to $67.6 million for the three months ended June 30, 2016 compared to $71.6 million for the three months ended June 30, 2015.*** Our direct revenues increased by $5.3 million, or 15.6%, to $39.6 million, offset by our global commercial revenues which decreased by $9.2 million, or 27.1%, to $24.8 million. Our global commercial revenue comparisons are impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose timing of orders can vary from quarter to quarter. These ordering patterns can result in significant unit volume variations, which can result in significant variation in quarter over quarter comparisons.
>
> Global Commercial: Revenues from global commercial decreased $9.2 million, or 27.1%, to $24.8 million for the three months ended June 30, 2016 compared to $34.0 million for the three months ended June 30, 2015. Global commercial revenues decreased primarily as a result of lower orders from certain commercial distributors, primarily in the dental and trauma markets.

111.    The 2Q16 10-Q also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

112.    The statements in the 2Q16 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

113.    On October 25, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its third quarter 2016 financial results in a

press release that stated, in relevant part: "Worldwide revenues were $66.5 million for the third quarter of 2016, which were comparable to revenues for the third quarter of 2015. Domestic revenues were $61 million for the third quarter of 2016, which were also comparable to revenues for the third quarter of 2015." The press release further stated:

> International revenues were $5.6 million for the third quarter of 2016, a slight increase compared to revenues of $5.5 million for the third quarter of 2015. On a constant currency basis, international revenues for the third quarter of 2016 increased 2 percent compared to the third quarter of 2015.

> Direct revenues of $38.1 million increased 14 percent for the third quarter of 2016 compared to $33.2 million for the third quarter of 2015. Commercial and other revenues of $28.5 million decreased 14 percent for the third quarter of 2016 compared to $33.3 million for the third quarter of 2015.

114. On October 25, 2016, RTI held a conference call to discuss the third quarter 2016 financial results with analysts and investors. During the call, defendant Hutchison stated that 14% growth in the direct business "was offset by declines in our commercial business, primarily due to lower orders from our commercial distributors in our spine and orthofixation product line."

115. The above statements on October 25, 2016 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

116. On November 7, 2016, Hutchison, Jordheim, Gearen, McEachin, Selquist, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q with

the SEC for the period ended September 30, 2016 (the "3Q16 10-Q"). It was signed by defendants

Hutchison and Jordheim. It stated, in relevant part:

> ***Our total revenues of $66.5 million for the three months ended September 30, 2016 were comparable to the three months ended September 30, 2015.*** Our direct revenues increased by $4.8 million, or 14.5%, to $38.1 million, offset by our global commercial revenues which decreased by $4.9 million, or 16.2%, to $25.3 million. Our global commercial revenue comparisons are impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose timing of orders can vary from quarter to quarter. These ordering patterns can result in significant unit volume variations, which can result in significant variation in quarter over quarter comparisons. ***In addition, global commercial revenues decreased primarily as a result of lower orders from certain commercial distributors, primarily in the spinal and trauma markets.***
>
> Global Commercial: ***Revenues from global commercial decreased $4.9 million, or 16.2%, to $25.3 million for the three months ended September 30, 2016 compared to $30.2 million for the three months ended September 30, 2015.*** Global commercial revenues decreased primarily as a result of lower orders from certain commercial distributors, primarily in the spinal and trauma markets.

117.    The 3Q16 10-Q also stated that "the design and operation of [RTI's] disclosure

controls and procedures were effective as of the end of the period covered by this report."

118.    The statements in the 3Q16 10-Q were materially misleading because they failed

to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily

for OEM customers, were shipped early to customers without obtaining authorized approval; (2)

that unapproved shipments were shipped early to report additional revenue by pulling forward

revenue from a future quarter; (3) that there were material weaknesses in the Company's internal

control over financial reporting, including with respect to the accuracy of journal entries and the

accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and

procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely

to restate its financial statements.

119.    On February 23, 2017, Jordheim, Louw, Singer, Gearen, McEachin, Selquist, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its fourth quarter 2016 financial results in a press release that stated, in relevant part:

> **Fourth Quarter 2016 Worldwide revenues were $71.3 million for the fourth quarter of 2016, a decrease of 6 percent, domestic revenues were $64.6 million, a decrease of 9 percent, and international revenues were $6.8 million, an increase of 24 percent from 2015's fourth quarter. The decrease in domestic revenue was primarily due to lower orders in the commercial /other business in 2016 coming off a very strong 2015;** partially offset by strong growth in the domestic direct businesses. The increase in international revenues was mainly driven by growth in Asia, primarily in Spine.
>
> **Direct revenues were $44.5 million for the fourth quarter of 2016, an increase of 22 percent compared to the fourth quarter of 2015,** with particular strength in Spine. RTI's spine business continues to be one of the fastest-growing spine businesses in the U.S., primarily due to increases in surgeon users and distributor relationships. **Commercial/other revenues were $26.8 million for the fourth quarter of 2016.**

120.    Also on February 23, 2017, RTI held a conference call to discuss its fourth quarter 2016 financial results with analysts and investors.  During the call, Jordheim stated that "[t]he Board and management team have begun to strategically direct investments in the company toward areas where we see the greatest growth potential," which had purportedly delivered results based on, among other things, "the signs of stabilization we are seeing in our commercial business."

121.    During the same call, defendant Louw stated that "[d]espite the decline, *we saw signs of stabilization in the commercial/other business during the year as the commercial/other business averaged $28 million over the last four quarters of 2016.*"

122.    The above statements on February 23, 2017 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses

in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

123.    On March 13, 2017, defendants Jordheim, Louw, Singer, Gearen, McEachin, Selquist, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2016 (the "2016 10-K"), which was signed by these defendants.  Regarding RTI's revenue recognition policy, the 2016 10-K stated, in relevant part:

> ***Revenue Recognition***—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.
>
> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.
>
> The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized. Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.
>
> Other revenues consists of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

124.    The 2016 10-K stated that RTI's "management believes that, as of December 31, 2016, the Company's internal control over financial reporting is effective."  Moreover, the 2016 10-K contained SOX certifications signed by Jordheim and Louw, attesting to the accuracy of the

financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

125.    The statements in the 2016 10-K were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

126.    On May 3, 2017, Jordheim, Louw, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2017 (the "1Q17 10-Q").  It was signed by defendants Farhat and Jordheim and stated, in relevant part:

> Total Revenues. ***Our total revenues of $69.9 million for the three months ended March 31, 2017, increased $2.6 million, or 3.8%, compared to $67.4 million for the three months ended March 31, 2016.*** Our direct revenues increased by $5.1 million, or 13.3%, to $43.8 million, offset by our global commercial revenues which decreased by $1.7 million, or 6.9%, to $23.6 million. Our global commercial revenue comparisons are impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose timing of orders can vary from quarter to quarter. These ordering patterns can result in significant unit volume variations, which can result in significant variation in quarter over quarter comparisons. In addition, global commercial revenues decreased primarily as a result of lower orders from certain commercial distributors, primarily in the orthopedics and trauma markets.
>
> Global Commercial: ***Revenues from global commercial decreased $1.7 million, or 6.9%, to $23.6 million for the three months ended March 31, 2017, compared to $25.3 million for the three months ended March 31, 2016.*** Global commercial

revenues decreased primarily as a result of lower orders from certain commercial distributors, primarily in the orthopedics and trauma markets.

127.    The 1Q17 10-Q also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

128.    The statements in the 1Q17 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that, by expediting shipping and overloading commercial customers with orders, the Individual Defendant were responsible for the demand slowdown; (4) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (5) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (6) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

129.    On August 8, 2017, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its second quarter 2017 financial results in a press release that stated, in relevant part:

> *RTI worldwide revenues were $72.1 million for the second quarter of 2017, an increase of 7 percent.* Direct revenues were $43.6 million for the second quarter of 2017, an increase of 10 percent compared to the second quarter of 2016, with double-digit growth reported in RTI's spine, surgical specialties and cardiothoracic direct business segments. *Commercial/other revenues were $28.6 million for the second quarter of 2017, an increase of 2 percent compared to the second quarter of 2016.*

130.    In the same press release, defendant Farhat stated that "[*o*]*ur Commercial business continues to stabi*lize, our direct business delivered another quarter of strong performance and our

Spine business continues to grow at above-market rates. ***We are encouraged by our strong second quarter results*** . . . ."

131.    On August 8, 2017, RTI held a conference call to discuss the second quarter 2017 financial results with analysts and investors.  During the call, defendant Farhat stated that "***commercial continues to stabilize and has returned to growth***, the first time we have reported top line growth in this business in five quarters, and we intend to continue to work on improving its performance."  Likewise, Jordheim stated "[o]ur commercial business continues to stabilize and grew 4% in the second quarter. We are starting to see the results of our cost reduction initiatives."

132.    The statements on August 8, 2017 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that revenue in the direct division had been inflated in July 2017 through an improper $30,000 adjustment; (4) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (5) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (6) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

133.    On August 9, 2017, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q for the period ended June 30, 2017 (the "2Q17 10-Q").  It was signed by defendants Farhat and Jordheim.  It stated, in relevant part:

Total Revenues. ***Our total revenues of $72.1 million for the three months ended June 30, 2017, increased $4.5 million, or 6.7%, compared to $67.6 million for the three months ended June 30, 2016.*** Our direct revenues increased by $4.0 million, or 10.0%, to $43.6 million, and our global commercial revenues increased by $1.1 million, or 4.3%, to $25.8 million. Our global commercial revenue comparisons are impacted due to a significant amount of our revenue being derived from large global commercial stocking distributors, whose timing of orders can vary from quarter to quarter. These ordering patterns can result in significant unit volume variations, which can result in significant variation in quarter over quarter comparisons. ***In addition, global commercial revenues increased primarily as a result of higher orders from certain commercial distributors, primarily in the dental and trauma markets.***

Global Commercial: Revenues from global commercial increased $1.1 million, or 4.3%, to $25.8 million for the three months ended June 30, 2017, compared to $24.8 million for the three months ended June 30, 2016. ***Global commercial revenues increased primarily as a result of higher orders from certain commercial distributors, primarily in the dental and trauma markets.***

134.    The 2Q17 10-Q also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

135.    The statements in the 2Q17 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that, by expediting shipping and overloading commercial customers with orders, the Individual Defendant were responsible for the demand slowdown; (4) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (5) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (6) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

136.    On November 2, 2017, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its third quarter 2017 financial

results in a press release that stated, in relevant part: "RTI generated $66.7 million in revenue, driven by growth in the company's spine, commercial and international businesses. Earnings for the third quarter totaled $16.5 million."

137.    The above statements on November 2, 2017 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

138.    On November 3, 2017, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q for the period ended September 30, 2017 (the "3Q17 10-Q").  It was signed by defendants Farhart and Singer.  It stated, in relevant part:

> Total Revenues: *Our total revenues of $208.7 million for the nine months ended September 30, 2017, increased $7.2 million, or 3.6%, compared to $201.5 million for the nine months ended September 30, 2016.* Our direct revenues increased by $8.3 million, or 7.2%, to $124.6 million due to increased distributions, offset primarily as a result of an estimated $1.2 million loss in revenue due to a hurricane in Florida, and our *global commercial revenues increased by $829,000, or 1.1%, to $76.2 million, primarily as a result of higher orders from certain commercial distributors, primarily in the dental and trauma markets.*

139.    The 3Q17 10-Q also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

140.    The statements in the 3Q17 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that unapproved shipments were shipped early to report additional revenue by pulling forward revenue from a future quarter; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

141.    On March 2, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its annual report on Form 10-K with the SEC for the period ended December 31, 2017 (the "2017 10-K"), which was signed by these defendants. Regarding RTI's revenue recognition policy, the 2017 10-K stated, in relevant part:

> ***Revenue Recognition—Revenue is recognized upon shipping, or receipt by the Company's customers of the implant, depending on the Company's distribution agreements with the Company's customers or distributors. Other revenues are recognized when all significant contractual obligations have been satisfied.***
>
> The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. ***Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.***
>
> ***The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized.*** Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.
>
> Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees,

distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

142.    In addition, the 2017 10-K stated that the Company had adopted a five-step framework set forth by the FASB for revenue recognition.  Specifically, the report stated, in relevant part:

> *Revenue from Contracts with Customers* — In May 2014, the FASB, issued a new revenue recognition standard which amends revenue recognition principles and provides a single, comprehensive set of criteria for revenue recognition within and across all industries. The new standard provides a five-step framework whereby revenue is recognized when control of promised goods or services are transferred to a customer at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The standard also requires enhanced disclosures pertaining to revenue recognition in both interim and annual periods. In August 2015, the FASB deferred the effective date of the new revenue standard from January 1, 2017 to January 1, 2018. In March 2016, the FASB issued amendments to clarify the implementation guidance on principal versus agent considerations. In April 2016, the FASB issued amendments to clarify the guidance on accounting for licenses of intellectual property and identifying performance obligations. In May 2016, the FASB issued amendments related to collectability, non-cash consideration, the presentation of sales and other similar taxes collected from customers and transition. The standard allows for adoption using a full retrospective method or a modified retrospective method. ***On January 1, 2018, the Company adopted this standard using the modified retrospective method. The Company's implementation approach included performing a detailed review of its agreements. The Company has reviewed all types of customer contracts and has gone through the five step process outlined in the new revenue recognition standard for each type of contract.*** The new five step process required by the new revenue recognition standard provides results substantially consistent with the Company's current revenue recognition policies. In addition, the Company designed internal controls to enable the preparation of financial information. The Company is in the process of finalizing its conclusions on key accounting assessments related to the new standard, including its assessment that the impact of accounting for costs incurred to obtain a contract.

> The Company identified two contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The Company currently estimates the impact of adopting the new revenue standard on the two contracts will result in a $1,800 to $2,200 reduction in accumulated deficit, the cumulative effect adjustment under the modified retrospective approach, a $2,500 to $3,000 increase in accounts receivable, and a $700 to $800 decrease in deferred tax assets. The Company also identified a contract that contains significant

upfront payments; however, the Company has not yet finalized its assessment of the contract. Except for the three contracts discussed above, the Company does not anticipate the finalization of this assessment will result in a material impact to the Company's financial position, results of operations, and disclosures.

143.    The 2017 10-K stated that RTI's "management believes that, as of December 31, 2017, the Company's internal control over financial reporting is effective."  Moreover, the 2017 10-K contained SOX certifications signed by defendants Farhat and Singer, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

144.    The statements in the 2017 10-K were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

145.    On March 26, 2018, Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held April 30, 2018.  In the proxy statement, these nine directors solicited stockholder votes in favor of three management proposals, including: (i) a proposal to elect Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis to new terms as directors; and (ii) a proposal to adopt the RTI Surgical Inc. 2018 Incentive Compensation Plan (the "2018 Plan").

146.    The proxy statement disclosed that the Board had determined that Farhat was not independent.

147. Regarding corporate governance and risk oversight, the proxy statement stated that the full board was responsible for:

> Strategic, financial and execution risks and exposures associated with our business strategy, management succession planning, policy matters, significant litigation and regulatory exposures, and other current matters that may present material risk to our financial performance, operations, infrastructure, plans, prospects or reputation, mergers and acquisition activities and related integration matters, and divestitures.

148. Moreover, the proxy statement stated that McEachin, Stolper, and Weis served on the Audit Committee. Regarding the Audit Committee's responsibilities, the proxy statement stated, in relevant part:

> [The Audit Committee's primary areas of oversight include:] Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure, internal control over financial reporting, financial infrastructure, investment guidelines and credit and liquidity matters. In addition, our programs and policies relating to legal and ethical compliance, quality, safety, environmental assurance and information technology security programs.
>
> *        *        *
>
> Our Audit Committee is charged with, among other things, the appointment of our independent registered public accounting firm, as well as discussing and reviewing with the independent registered public accounting firm the scope and the results of the annual audit, pre-approving the engagement of the independent registered public accounting firm for all audit-related services and permissible non-audit related services, and reviewing and approving all related-party transactions. Our Audit Committee also reviews interim financial statements included in our quarterly reports and reviews financial statements and related documents filed with the Securities and Exchange Commission.

149. Regarding non-employee director compensation, the proxy statement told stockholders that each of Gearen, McEachin, Singer, Thomas, Valeriani, and Weis received compensation from RTI for their service on the Board during 2017 ranging between $125,000 and $136,250. In addition, Selquist received $175,000 in compensation, whereas Stolper and Sweeney received $102,000 and $115,000, respectively.

150.    In addition to this excessive compensation, the proxy statement solicited stockholder approval of the 2018 Plan.  According to the proxy statement, the 2018 Plan is administered by the Compensation Committee.  Specifically, the proxy statement stated:

> The 2018 Plan is to be administered by the Compensation Committee of the Board, provided, however, that except as otherwise expressly provided in the 2018 Plan, the independent members of the Board may elect to exercise any power or authority granted to the Committee under the 2018 Plan. Subject to the terms of the 2018 Plan, the Committee is authorized to select eligible persons to receive Awards, grant Awards, determine the type, number and other terms and conditions of, and all other matters relating to, Awards, prescribe Award agreements (which need not be identical for each participant) and the rules and regulations for the administration of the 2018 Plan, construe and interpret the 2018 Plan and Award agreements, correct defects, supply omissions or reconcile inconsistencies therein, and make all other decisions and determinations as the Committee may deem necessary or advisable for the administration of the 2018 Plan. Decisions of the Committee shall be final, conclusive and binding on all persons or entities, including the Company, any subsidiary or any participant or beneficiary, or any transferee under the 2018 Plan or any other person claiming rights from or through any of the foregoing persons or entities.

151.    If approved, the number of shares reserved for issuance under the 2018 Plan would be 5,738,142 shares, which represents 9.2% of the total number of shares outstanding as of March 9, 2018.

152.    The proxy statement was materially misleading for the following reasons: (i) it misrepresented the actual activities of the Board, as well as the Audit Committee, with respect to risk management and oversight while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.  A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

153.    On May 1, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement.  In particular: (i) Farhat,

Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis were reelected to terms as directors; and (ii) the 2018 Plan was approved by stockholders. The reelection of Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis and the approval of the 2018 Plan based on the misleading statements contained in the 2018 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and their continued enrichment at the expense of the Company's unaffiliated stockholders.

154. On May 3, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its first quarter 2018 financial results in a press release that stated, in relevant part:

> *RTI's worldwide revenues for the first quarter of 2018 were $69.9 million, comparable with the prior year first quarter. First quarter revenues were driven by growth in the OEM and International lines of business,* which were partially offset by declines in Sports and Spine and a $3.2 million reduction from the sale of substantially all the assets of the cardiothoracic closure business completed in August 2017. Gross profit for the first quarter of 2018 was $33.7 million, or 48.2% of revenues, compared to $35.8 million, or 51.2% of revenues, in the first quarter of 2017. Gross profit for the first quarter of 2018 was impacted by an inventory charge of $1.0 million from the write-off of inventory related to our international restructuring and $0.2 million due to the purchase accounting step-up of Zyga inventory.

155. On May 3, 2018, the Company held a conference call to discuss the first quarter 2018 financial results with analysts and investors. During the call, defendant Farhat claimed that RTI "delivered revenue of approximately $69.9 million, which was driven by strong performance in [its] OEM and International franchises."

156. The statements on May 3, 2018 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3)

that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and

(4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

157.    On May 4, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q"). It was signed by Farhat and Singer. It stated, in relevant part:

> Total revenues - ***Our total revenues of $69.9 million for the three months ended March 31, 2018 was comparable to the three months ended March 31, 2017.*** Excluding cardiothoracic revenues for the three months ended March 31, 2017, our total revenues increased $3.1 million, or 4.6%, primarily due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.
>
> ***OEM - Revenues from OEM increased $5.0 million, or 19.8%, to $30.1 million for the three months ended March 31, 2018***, compared to $25.1 million for the three months ended March 31, 2017. ***OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors***, primarily in the dental and trauma markets.

158.    The 1Q18 10-Q also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

159.    The statements in the 1Q18 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

160.    On August 2, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its second quarter 2018 financial results in a press release that stated "RTI's worldwide revenues for the second quarter of 2018 were $70.7

million, down slightly compared with $72.1 million during the same period for the year. Excluding a $3.7 million reduction [related to the sale of certain assets], our total revenues increased $2.2 million, or 3.3%."

161.    The statements on August 2, 2018 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

162.    On August 3, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q for the period ended June 30, 2018 (the "2Q18 10-Q"). It was signed by defendants Farhat and Singer. It stated, in relevant part:

> **Total revenues - Our total revenues decreased $1.4 million, or 2.0%, to $70.7 million for the three months ended June 30, 2018, compared to $72.1 million for the three months ended June 30, 2017.** Excluding cardiothoracic revenues for the three months ended June 30, 2017, our total revenues increased $2.2 million, or 3.3%, primarily due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.
>
> **OEM - Revenues from OEM increased $3.2 million, or 11.4%, to $31.2 million for the three months ended June 30, 2018, compared to $28.0 million for the three months ended June 30, 2017. OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.**

163.    The 2Q18 10-Q also stated that "the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."

164.     The statements in the 2Q18 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

165.     On November 1, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to announce its third quarter 2018 financial results in a press release that stated, in relevant part:

> RTI's worldwide revenues for the third quarter of 2018 were $69.1 million, compared with $66.7 million during the same period in the prior year. Excluding a $1.3 million reduction from the sale of substantially all the assets of the Cardiothoracic Closure business completed in August 2017, total revenues increased $3.7 million, or 5.7%, driven by strong performance in both the spine and OEM franchises. Gross profit for the third quarter of 2018 was $37.7 million, or 54.5% of revenues, a significant increase compared to $33.5 million, or 50.3% of revenues, in the third quarter of 2017.
>
> *     *     *
>
> Our OEM franchise continued its strong performance this quarter. Our team has done a tremendous job of getting closer to our customers, better understanding their needs and the direction of the market and focusing our operations accordingly to drive growth. The changes we have implemented are really paying off and our credit to all involved.

166.     On November 1, 2018, RTI held a conference call to discuss the third quarter 2018 financial results with analysts and investors.  During the call, defendant Farhat stated that "we ***returned the OEM franchise to growth*** and made progress on our current spine portfolio . . . . [W]ith these initiatives now ingrained in our corporate culture, we are producing improved operational and financial performance."

167.    The statements on November 1, 2018 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

168.    On November 7, 2018, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report on Form 10-Q for the period ended September 30, 2018 (the "3Q18 10-Q"). It was signed by defendants Farhat and Singer and stated that total revenues "increased $2.4 million, or 3.6%, to $69.1 million for the three months ended September 30, 2018 . . . ." It also stated:

> OEM - Revenues from OEM increased $1.3 million, or 4.6%, to $30.1 million for the three months ended September 30, 2018, compared to $28.8 million for the three months ended September 30, 2017. OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.

169.    Regarding ASC 606, the 3Q18 10-Q stated: "Whereas previously, revenue and receivables were recorded at the time of shipment, they are now recorded over time."

170.    The 3Q18 10-Q also stated that "the design and operation of our disclosure controls and procedures were effective as of the end of the period covered by this report."

171.    The statements in the 3Q18 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting,

including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

172.     On February 28, 2019, RTI held a conference call to discuss the fourth quarter 2018 financial results with analysts and investors.  During the call, Singer discussed the Paradigm acquisition, stating that "[e]verybody is very aligned on driving towards a successful integration and closing the deal with momentum."  He also stated "when we close this transaction, we'll hit the ground running" and "we've done a tone of work and have had tremendous cooperation and collaboration. And so, we feel very good about where we're positioned at the outset of the close."

173.     The above statements on February 28, 2019 were materially misleading because they failed to disclose: (1) that the Paradigm transaction was rife with serious errors relating to asset valuation and purchase accounting; and (2) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

174.     On March 5, 2019, Farhat, Singer, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K"), which was signed by these defendants.  Regarding RTI's revenue recognition policy, the 2018 10-K stated, in relevant part:

> ***Revenue Recognition—The Company recognizes revenue upon shipping, or receipt by the Company's customers of its products and implants, depending on the Company's distribution agreements with its customers or distributors.*** The Company's performance obligations consist mainly of transferring control of implants identified in the contracts. The Company typically transfers control at a point in time upon shipment or delivery of the implants for direct sales, or upon implantation for sales of consigned inventory. The customer is able to direct the use of, and obtain substantially all of the benefits from, the implant at the time the implant is shipped, delivered, or implanted, respectively based on the terms of the contract. For performance obligations related to the Company's contracts with exclusively built inventory clauses, the Company typically satisfies its performance obligations evenly over the contract term as inventory is built. Such exclusively

manufactured inventory has no alternative use and the Company has an enforceable right to payment for performance to date. The Company uses the input method to measure the manufacturing activities completed to date, which depicts the progress of the Company's performance obligation of transferring control of exclusively built inventory. For the contracts with upfront and annual exclusivity fees, revenue related to those fees is recognized over the contract term following a consistent method of measuring progress towards satisfaction of the performance obligation. The Company uses the method and measure of progress that best depicts the transfer of control to the customer of the goods or services to date relative to the remaining goods or services promised under the contract.

The Company permits returns of implants in accordance with the terms of contractual agreements with customers if the implant is returned in a timely manner, in unopened packaging, and from the normal channels of distribution. ***Allowances for returns are provided based upon analysis of the Company's historical patterns of returns matched against the revenues from which they originated.***

***The Company records estimated implant returns, discounts, rebates and other distribution incentives as a reduction of revenue in the same period revenue is recognized.*** Estimates of implant returns are recorded for anticipated implant returns based on historical distributions and returns information. Estimates of discounts, rebates and other distribution incentives are recorded based on contractual terms, historical experience and trend analysis.

Other revenues consist of service processing, tissue recovery fees, biomedical laboratory fees, recognition of previously deferred revenues, shipping fees, distribution of reproductions of our allografts to distributors for demonstration purposes and restocking fees which is included in revenues.

175.    Regarding revenue from contracts with customers, the 2018 10-K stated, in relevant

part:

***Revenue from Contracts with Customers—On January 1, 2018, the Company adopted a new accounting standard issued by the FASB on revenue recognition using the modified retrospective method.*** This new accounting standard outlines a single comprehensive model to use in accounting for revenue arising from contracts with customers. This standard supersedes existing revenue recognition requirements and eliminates most industry-specific guidance from GAAP. The core principle of the new accounting standard is to recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In addition, the adoption of this new accounting standard resulted in increased disclosure, including qualitative and quantitative disclosures about the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers. ***The new accounting standard was applied to all***

***contracts, apart from contracts for which all or substantially all revenue was recognized before January 1, 2018.*** Additionally, the Company elected to account for shipping and handling activities as a fulfillment cost rather than a separate performance obligation.

The Company identified three contracts which previously resulted in revenue recognition occurring at the time of shipment; however, under the new revenue recognition standard, the Company is required to recognize revenue over time. The assessment of our January 1, 2018, consolidated balance sheet under ASC Topic 606 resulted in a cumulative-effect adjustment to opening retained earnings, unbilled accounts receivable and costs incurred for inventory.

176.     The 2018 10-K further reported OEM revenues for the fiscal years ended December 31, 2018 and 2017, respectively, as follows:

***OEM—Revenues from OEM increased $10.0 million, or 9.0%, to $120.7 million for the year ended December 31, 2018 compared to $110.7 million for the year ended December 31, 2017.*** OEM revenues increased primarily as a result of higher orders and due to timing of delivery to certain OEM distributors, primarily in the dental and trauma markets.

177.     The 2018 10-K stated that RTI's "management believes that, as of December 31, 2018, the Company's internal control over financial reporting is effective."  Moreover, the 2018 10-K contained SOX certifications signed by Farhat and Singer, attesting to the accuracy of the financial statements contained therein, the disclosure of all fraud, and the effectiveness of the Company's internal control over financial reporting.

178.     The statements in the 2018 10-K were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (3) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (4) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

179. On May 2, 2019, RTI held a conference call to discuss the first quarter 2019 financial results with analysts and investors. During the call, defendant Signer stated: "RTI's worldwide revenue for the first quarter of 2019 was $69.7 million compared with $69.9 million during the same period for the prior year. . . . The majority of the decline in OEM is due to $1.1 million of revenue booked in the first quarter of 2018 which was shifted from the second quarter if you recall our discussions of last year."

180. On May 7, 2019, Farhat, Singer, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"). The report was signed by defendants Farhat and Singer. Therein, RTI reported revenue of $69.74 million and goodwill related to Paradigm of $248.55 million. Specifically, regarding the allocation of the purchase price for Paradigm, the Company reported:

|  | (In thousands) |
|---|---|
| Cash | $ 79 |
| Accounts receivable | 5,220 |
| Inventories | 5,898 |
| Other current assets | 1,752 |
| Property, plant and equipment | 379 |
| Current liabilities | (6,169) |
| Net tangible assets acquired | 7,159 |
| Goodwill | 248,547 |
| Total net assets acquired | $ 255,706 |

181. The 1Q19 10-Q also stated that RTI's CEO and CFO had "concluded that the design and operation of [the Company's] disclosure controls and procedures were effective as of the end of the period covered by this report." Regarding internal control over financial reporting, the report stated, in relevant part:

We implemented ASU 2016-02 as of January 1, 2019. As a result, we made the following significant modifications to internal control over financial reporting, including changes to accounting policies and procedures and documentation practices:

- Updated our policies and procedures related to accounting for lease assets and liabilities and related income and expense
- Modified our contract review controls
- Added controls for reevaluating our significant assumptions and judgments on a quarterly basis.
- Added controls to address required disclosures regarding leases, including our significant assumptions and judgments used in applying ASC 842.

Other than the items described above, there have not been any changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(d) or 15d-15(d) of the Exchange Act during the three months ended March 31, 2019, that materially affected, or that we believe are reasonably likely to materially affect, our internal control over financial reporting.

182.    The statements in ¶¶ 179–181 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that RTI did not appropriately prepare preliminary estimates of the purchase price allocation for Paradigm, resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

183.    On August 5, 2019, Farhat, Singer, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report for the period ended June 30, 2019 (the "2Q19 10-Q"), which was signed by defendants Farhat and Singer.  Therein, the Company reported revenue of $82.31 million.  Regarding the allocation of the purchase price for Paradigm, RTI reported:

| | | Balance at | | |
|---|---|---|---|---|
| | | June 30, 2019 | March 31, 2019 | Change |
| | | | (In thousands) | |
| Cash | $ | 79 | $ 79 | $ - |
| Accounts receivable | | 5,220 | 5,220 | - |
| Inventories | | 43,084 | 5,898 | 37,186 |
| Other current assets | | 1,693 | 1,752 | (59) |
| Property, plant and equipment | | 379 | 379 | - |
| Current liabilities | | (6,380) | (6,169) | (211) |
| Net tangible assets acquired | | 44,075 | 7,159 | 36,916 |
| Goodwill | | 211,631 | 248,547 | (36,916) |
| Total net assets acquired | $ | 255,706 | $ 255,706 | $ - |

184.    Regarding the Company's disclosure controls and procedures and its internal control over financial reporting, the 2Q19 10-Q was substantially similar to the statements identified with respect to the 1Q19 10-Q. The report also provided that RTI was "in the process of integrating Paradigm into [its] overall internal control over financial reporting processes."

185.    The statements in the 2Q19 10-Q were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that RTI did not appropriately prepare preliminary estimates of the purchase price allocation for Paradigm, resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

186.    On October 31, 2019, RTI held a conference call with analysts and investors regarding the third quarter 2019 financial results. During the call, Singer was asked to explain the "relatively large range" for the fourth quarter 2019 guidance; he replied, alluding to the unpredictability of revenue due to the Individual Defendants' accounting manipulation scheme:

Yeah, so there is a number of factors that play into it. Look, we were -- our forecast accuracy in the third quarter was obviously horrible …. I would say, stabilization and impact of new launches in established therapies is built into the guidance range. We do and have had some products back order and so if we stabilize the supply side, from a donor and donor quality perspective that will impact the range and then there's always a certain element of delivery window with the OEM customers that come into play at the end of the quarter. So those are the factors that go into it. I don't know if that's helpful or not.

187.     On November 7, 2019, Farhat, Singer, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused RTI to file its quarterly report for the period ended September 30, 2019 (the "3Q19 10-Q"), which was signed by Farhat and Singer.  Therein, the Company reported revenue of $79.13 million.  Regarding the allocation of the purchase price for Paradigm, RTI reported:

| | Balance at | | |
| | September 30, 2019 | June 30, 2019 | Change |
| --- | --- | --- | --- |
| | | (In thousands) | |
| Cash | $ 308 | $ 79 | $ 229 |
| Accounts receivable | 5,220 | 5,220 | - |
| Inventories | 43,084 | 43,084 | - |
| Other current assets | 1,693 | 1,693 | - |
| Property, plant and equipment | 379 | 379 | - |
| Current liabilities | (6,380) | (6,380) | - |
| Net tangible assets acquired | 44,304 | 44,075 | 229 |
| Goodwill | 176,749 | 211,631 | (34,882) |
| Total net assets acquired | $ 221,053 | $ 255,706 | $ (34,653) |

188.     The 3Q19 10-Q stated that the Company's CEO and CFO had "concluded that the design and operation of [RTI's] disclosure controls and procedures were effective as of the end of the period covered by this report."  It also stated that there "have not been any changes to [its] internal control over financial reporting" during the period.

189.     The statements in ¶¶ 186–88 were materially misleading because they failed to disclose: (1) that revenue was improperly recognized because certain customer orders, primarily for OEM customers, were shipped early to customers without obtaining authorized approval; (2) that RTI did not appropriately prepare preliminary estimates of the purchase price allocation for Paradigm, resulting in errors impacting intangible assets, acquisition contingencies, inventory, and

goodwill; (3) that there were material weaknesses in the Company's internal control over financial reporting, including with respect to the accuracy of journal entries and the accounting for sales returns; (4) that, as a result of the foregoing, RTI's disclosure controls and procedures were not effective; and (5) that, as a result of the foregoing, RTI was reasonably likely to restate its financial statements.

      D.    **The Truth Begins to Emerge**

         1.    **RTI Reveals That Certain OEM Contracts Were Improperly Recorded**

190.    On March 16, 2020, after the market closed, RTI disclosed that it could not timely file its annual report on Form 10-K for fiscal 2019 due to ongoing investigations by the SEC and the Audit Committee regarding revenue recognition. Specifically, in a press release, the Company stated, in relevant part:

> [RTI's Audit Committee] is ***in the process of conducting an internal investigation of current and prior period matters relating to the Company's revenue recognition practices regarding the timing of revenue with respect to certain contractual arrangements, primarily with OEM customers, including the accounting treatment, financial reporting and internal controls related to such arrangements***. The Audit Committee investigation was precipitated by an ongoing SEC investigation related to the periods 2014 through 2016. The Company will not be in a position to file its Form 10-K until the Audit Committee concludes its investigation and the Company and its independent auditor assess the results of that investigation. The Company is working to complete its analysis and file its Form 10-K for the year ended December 31, 2019 within the extension period (through March 31, 2020), but no assurance can be given that it will be able to do so.

191.    On this news, RTI's stock price fell $0.40 per share, nearly 15%, to close at $2.35 per share on March 17, 2020, on unusually heavy trading volume.

192.    On March 20, 2020, RTI issued a press release to disclose receipt of a letter from The Nasdaq Stock Market LLC, "indicating that, as a result of the Company's delay in filing its Form 10-K, the Company is not in compliance with the timely filing requirement for continued listing under Nasdaq Listing Rule 5250(c)(1)."

193. The same day, the Company filed a Form 8-K with the SEC stating that "[o]n March 17, 2020 the Company and Johannes W. Louw, Vice President Financial Planning and Analysis, agreed that Mr. Louw's employment with the Company would end no later than April 8, 2020."

194. On this news, RTI's stock price fell $0.44 per share, or 19.6%, to close at $1.80 per share on March 23, 2020, the next trading session.

195. On March 30, 2020, in a Form 8-K filed with the SEC, RTI revealed receipt of a letter on March 28, 2020 from counsel for Montagu "stating, among other things, that the Company is in breach of Section 7.5(a) of the Purchase Agreement as a result of its failure to file a proxy statement with the SEC within the time period set forth in the Purchase Agreement." RTI had thirty days to cure the breach. In the same report, the Company announced that it had postponed the special meeting of shareholders, which was set to vote on various proposals necessary to close the sale of the OEM business, and the annual meeting of shareholders, which had been scheduled for May 13, 2020.

196. On this news, RTI's stock price fell $0.20 per share, or 11%, to close at $1.68 per share on March 30, 2020.

197. On April 9, 2020, in a Form 8-K filed with the SEC, RTI disclosed certain findings from the Audit Committee's ongoing investigation, including that certain financial statements would be restated. Specifically, the Company stated:

> On April 7, 2020, the Audit Committee of the Board of Directors concluded that the Company will restate its previously issued audited financial statements for the years ended December 31, 2014, 2015, 2016, 2017 and 2018 and its unaudited financial statements for the quarterly periods for 2016-2018 and the nine months ended September 30, 2019 (the "Relevant Periods"). Accordingly, investors should no longer rely upon the Company's previously released financial statements as of and for the years ended December 31, 2018, 2017, 2016, 2015, and 2014, and the reports on the financial statements and internal control over financial reporting of the Company's independent registered public accounting firm thereon; or the

quarterly financial statements and other financial data released related to the Relevant Periods.

> ***The Company has concluded that revenue for certain invoices should have been recognized at a later date than when originally recognized.*** In response to binding purchase orders from certain OEM customers, ***goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows***. In many instances, the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions ***the goods were delivered early without obtaining the customers' affirmative approval. In addition, the Company has concluded that in July 2017, an adjustment was improperly made to a product return provision in the Direct Division.*** Accordingly, the Company will revise its financial statements to correct these errors and any others as it finalizes the Investigation. The Company and the Audit Committee of the Board of Directors have discussed these matters with Deloitte & Touche LLP, the Company's independent registered public accounting firm.

198.    On April 29, 2020, the Company announced certain amendments to its agreement to sell the OEM business to Montagu, including, among other things, a $50 million reduction in the purchase price, *i.e.*, from $490 million to $440 million. The Company also agreed to an extension on the closing of the transaction and an extension to file its 2020 proxy statement and 2019 annual report with the SEC.

199.    Moreover, in the same filing, RTI disclosed the terms of Louw's separation from the Company. Specifically, the Company stated, in relevant part:

> As previously announced, on March 17, 2020, the Company and Johannes W. Louw, Vice President Financial Planning and Analysis, agreed that Mr. Louw's employment with RTI Surgical would end no later than April 8, 2020. In connection with his departure, on April 24, 2020, RTI Surgical entered into a Separation Agreement and Release of Claims (the "Separation Agreement") and a Consultant Agreement (the "Consultant Agreement") with Mr. Louw.

> Pursuant to the terms of the Separation Agreement, Mr. Louw agreed to release RTI Surgical as well as its past and current parents, subsidiaries and affiliated organizations (including the Company) from certain claims arising prior to April 24, 2020, and reaffirm certain ongoing and post-employment obligations to RTI Surgical and the Company with respect to confidentiality. In exchange for such release and reaffirmation, RTI Surgical agreed to provide Mr. Louw with a separation payment in the amount of $195,294.00.

Pursuant to the terms of the Consultant Agreement, Mr. Louw agreed to provide certain services to RTI Surgical as a consultant from April 9, 2020 until the earlier of: (i) the consummation of the sale of the Company's OEM business pursuant to the Purchase Agreement; and (ii) the termination of such agreement. In exchange for such consultant services, RTI Surgical agreed to pay to Mr. Louw the following compensation: (i) $23,741 per month; (ii) reimbursement for reasonable and documented out-of-pocked expenses incurred by Mr. Louw in connection with performance of such services; and (iii) reimbursement of actual travel expenses in accordance with RTI's travel policy at the time of travel. Either party may terminate the Consultant Agreement at any time, with or without cause, by providing the other party 30 days' advance written notice.

### 2. RTI Restates its Financial Statements and Reports Material Weaknesses in its Internal Controls Over Financial Reporting

200.    On June 8, 2020, the Company filed a Form 10-K/A for the year ended December 31, 2018 (the "2018 Amended 10-K") with the SEC to restate its financial results for prior periods because, among other things, "revenue for certain invoices should have been recorded at a later date than when originally recognized" and "adjustments [had been] improperly or erroneously made to manual journal entry accrual/reserve accounts." Specifically, regarding the background for the restatement, the report stated:

Based on the results of the Investigation, the Company has concluded that revenue for certain invoices should have been recognized at a later date than when originally recognized. In response to binding purchase orders from certain OEM customers, goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows. In many instances the OEM customers requested or approved the early shipments, but the Company has determined that on other occasions the *goods were delivered early without obtaining the customers' affirmative approval. Some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter.* The revenue for those shipments is being restated, as well as for other orders that shipped earlier than the purchase order due date in the system for which the Company could not locate evidence that the OEM customers had requested or approved the shipments. In addition, the Investigation found that *in July 2017 a $30,000 adjustment was improperly made to a product return provision in the Direct Division that increased the Direct Division's revenue in the prior quarter.* The July 2017 adjustment prompted additional investigative steps. The Company has concluded that in the periods of the fourth quarter of 2015 through the fourth quarter of 2018 certain adjustments were improperly or erroneously made to manual journal entry accrual/reserve accounts, including a July 2017 adjustment to a product return

provision in the Direct Division. Accordingly, the Company has restated its financial statements to correct these errors.

In addition to the correction of the errors discussed above, the Company has also made other immaterial corrections in all periods presented. Such immaterial corrections reflected in the restated periods and, together with the other corrections described above, are referred to herein as "Current and Prior Period Adjustments." The corrections are included in these financial statements contained herein, which we refer to herein collectively as the "Restatement".

201.    The 2018 Amended 10-K detailed the restatement as follows:

a. <u>Revenue</u> – As noted above, the Company has concluded that in some instances revenue for certain invoices should have been recognized at a later date than when originally recognized. Under both ASC 605 and ASC 606, revenue on sales to OEM customers is typically recognized at a point in time upon shipment. The Company identified revenue from certain customer orders that was shipped early to customers without obtaining authorized approval, and thus was recognized in an incorrect period. There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments. Correction of these errors, when including the rollover effect from the immediately preceding periods, decreased revenue by $0.5 million in 2018, increased revenue by $0.8 million in 2017, and increased revenue by $3.1 million in 2016.

b. <u>Costs of processing and distribution</u> – Primarily as a result of the error corrections noted above, when including the rollover effect from the immediately preceding periods, costs of processing and distribution decreased by less than $0.1 million in 2018, increased by $0.2 million in 2017, and increased by $2.1 million in 2016.

c. <u>Operating expenses</u> – The Company corrected certain errors noted above, separate from the Investigation which increased operating expenses by $1.3 million, less than $0.1 million and $0.6 million, as of December 31, 2018, 2017, and 2016, respectively.

d. <u>Accounts receivable</u> – Primarily as a result of the error corrections noted above relating to the timing of revenue recognition, accounts receivable decreased by $0.3 million, increased by $0.1 million, and decreased by $0.6 million, as of December 31, 2018, 2017, and 2016, respectively.

e. <u>Inventories - net</u> – Primarily as a result of the error corrections noted above relating to the timing of revenue recognition, inventories - net increased by $0.2 million, less than $0.1 million, and $0.3 million as of December 31, 2018, 2017, and 2016, respectively.

f. <u>Prepaid and other current assets</u> – The Company corrected certain errors noted above, separate from the investigation, which decreased prepaid and other current

assets by $0.4 million, increased by $0.3 million, and decreased by less than $0.1 million, as of December 31, 2018, 2017, and 2016, respectively.

g. Property, plant and equipment – net – The Company corrected certain errors noted above, separate from the investigation, which increased property, plant and equipment – net by $0.1 million, as of December 31, 2016.

h. Deferred tax assets – The Company corrected certain errors noted above, relating to the tax effects of changes to the timing of revenue recognition, which increased deferred tax assets by $0.3 million, decreased by $0.1 million, and increased by $0.1 million as of December 31, 2018, 2017, and 2016, respectively.

i. Other intangible assets – net – The Company corrected certain errors, separate from the investigation, which decreased net other intangible assets – net by $0.8 million and $0.5 million as of December 31, 2018 and 2017, respectively, and increased other intangible assets – net by less than $0.1 million as of December 31, 2016.

j. Accounts payable – The Company corrected certain errors, separate from the investigation, which decreased accounts payable by $0.1 million as of December 31, 2018 and 2017, and by less than $0.1 million as of December 31, 2016.

k. Accrued expenses – The Company corrected certain errors noted above, separate from the investigation, which increased accrued expenses by $1.2 million, $0.1 million, and $0.4 million, as of December 31, 2018, 2017, and 2016, respectively.

l. Other long-term liabilities – As a result of the impact of the error corrections noted above, separate from the investigation, long-term liabilities increased $0.4 million as of December 31, 2016.

m. Payments for treasury stock – The Company corrected certain errors, separate from the investigation, which reclassified operating cash flows to financing cash flows for purchases of treasury stock by $0.5 million and $3.3 million as of December 31, 2018 and 2017, respectively.

202.    The 2018 Amended 10-K contained restatements of line items for the financial statements for the relevant periods.  As to restatement for revenue, the report provided, in relevant part:

| Year Ended December 31, 2018 | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenues | $ 280,855 | $ (493) | $ 280,362 |
| Costs of processing and distribution | 140,732 | (13) | 140,719 |
| Gross profit | 140,123 | (480) | 139,643 |
|    Marketing, general and administrative | 119,217 | 507 | 119,724 |
|    Severance and restructuring costs | 2,280 | 528 | 2,808 |
|    Asset impairment and abandonments | 4,774 | 296 | 5,070 |
|       Total operating expenses | 142,624 | 1,331 | 143,955 |
| Operating (loss) | (2,501) | (1,811) | (4,312) |
| (Loss) before income tax benefit | (5,580) | (1,811) | (7,391) |
| Income tax benefit | 4,331 | (63) | 4,268 |
| Net (loss) | (1,249) | (1,874) | (3,123) |
| Net (loss) applicable to common shares | $ (3,369) | $ (1,874) | $ (5,243) |
| Comprehensive (loss) income | $ (4,310) | $ (1,874) | $ (6,184) |
| Net (loss) per common share - basic | $ (0.05) | $ (0.03) | $ (0.08) |
| Net (loss) per common share - diluted | $ (0.05) | $ (0.03) | $ (0.08) |

| Year Ended December 31, 2017 | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenues | $ 279,563 | $ 786 | $ 280,349 |
| Costs of processing and distribution | 137,042 | 235 | 137,277 |
| Gross profit | 142,521 | 551 | 143,072 |
|    Marketing, general and administrative | 115,103 | (94) | 115,009 |
|    Research and development | 13,375 | (60) | 13,315 |
|    Severance and restructuring costs | 12,173 | (157) | 12,016 |
|    Executive transition costs | 2,781 | 37 | 2,818 |
|    Asset impairment and abandonments | 3,739 | 295 | 4,034 |
|       Total operating expenses | 113,711 | 21 | 113,732 |
| Operating income | 28,810 | 530 | 29,340 |
| Income before income tax (provision) | 25,725 | 530 | 26,255 |
| Income tax (provision) | (19,453) | 104 | (19,349) |
| Net income | 6,272 | 634 | 6,906 |
| Net income applicable to common shares | $ 2,549 | $ 634 | $ 3,183 |
| Comprehensive income | $ 4,536 | $ 634 | $ 5,170 |
| Net income per common share - basic | $ 0.04 | $ 0.01 | $ 0.05 |
| Net income per common share - diluted | $ 0.04 | $ 0.01 | $ 0.05 |

| Year Ended December 31, 2016 | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenues | $ 272,865 | $ 3,119 | $ 275,984 |
| Costs of processing and distribution | 140,516 | 2,141 | 142,657 |
| Gross profit | 132,349 | 978 | 133,327 |
| Marketing, general and administrative | 116,125 | 541 | 116,666 |
| Research and development | 16,090 | 207 | 16,297 |
| Asset impairment and abandonments | 5,435 | (194) | 5,241 |
| Total operating expenses | 148,030 | 554 | 148,584 |
| Operating (loss) | (15,681) | 424 | (15,257) |
| Foreign exchange (loss) gain | (132) | 3 | (129) |
| Total other expense - net | (1,779) | 3 | (1,776) |
| (Loss) before income tax benefit | (17,460) | 427 | (17,033) |
| Income tax benefit | 3,061 | 167 | 3,228 |
| Net (loss) | (14,399) | 594 | (13,805) |
| Net (loss) applicable to common shares | $ (17,907) | $ 594 | $ (17,313) |
| Comprehensive (loss) | $ (19,181) | $ 594 | $ (18,587) |
| Net (loss) per common share - basic | $ (0.31) | $ 0.01 | $ (0.30) |
| Net (loss) per common share - diluted | $ (0.31) | $ 0.01 | $ (0.30) |

203.   In addition, the 2018 Amended 10-K identified material weaknesses in RTI's internal control over financial reporting.  Specifically, the report stated, in relevant part:

Based on this evaluation of our disclosure controls and procedures, our CEO and CFO have concluded that our *disclosure controls and procedures were not effective as of December 31, 2018* because of certain material weaknesses in our internal control over financial reporting, as further described below.

\*       \*       \*

Management, including our CEO and CFO, assessed the Company's internal control over financial reporting and concluded that they were not effective as of December 31, 2018 ("Evaluation Date"). In making this assessment, management used the criteria set forth by the COSO framework. Based on evaluation under these criteria, management determined, based upon the existence of the material weaknesses described below, that we did not maintain effective internal control over financial reporting as of the Evaluation Date.

\*       \*       \*

We did not maintain an effective control environment based on the criteria established in the COSO framework. *We have identified deficiencies in the principles associated with the control environment of the COSO framework.* Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) appropriate organizational structure, reporting lines, and authority and responsibilities in pursuit of objectives; (ii) our commitment to attract, develop, and retain competent individuals; and (iii) holding individuals accountable for their internal control related responsibilities. As disclosed in the consolidated financial statements included in Item 8. "Financial

Statements and Supplementary Data", these material weaknesses contributed to accounting errors.

We did not maintain an effective control environment to enable the identification and mitigation of risks of accounting errors based on the contributing factors to material weakness in the control environment, including: ***The tone from executive management was insufficient to create the proper environment for effective internal control over financial reporting and to ensure that: (i) there were adequate processes for oversight; (ii) there was accountability for the performance of internal control over financial reporting responsibilities; (iii) personnel with key positions had the appropriate training to carry out their responsibilities; and (iv) corrective activities were appropriately applied, prioritized, and implemented in a timely manner***. . . .

We did not design and implement effective control activities based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the control activities component of the COSO framework. Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) selecting and developing control activities and information technology that contribute to the mitigation of risks and support achievement of objectives; and (ii) deploying control activities through policies that establish what is expected and procedures that put policies into action.

The following were contributing factors to the material weaknesses in control activities:

- Lack of consistently established controls to segregate the function of recording and approving journal entries, as well as preparation and review of reconciliations with appropriate supporting documentation.
- Inconsistent documentation and retention of support for the review and approval of manual journal entries.
- Inconsistent documentation and application of accounting policies and/or practice for the sales returns reserve and certain accrual accounts.
- Insufficient resources within the accounting and financial reporting department to review the accounting for non-recurring complex purchase accounting, contingent payment and segment reporting transactions.
- Insufficient design and operation of certain control activities to respond to potential risk of material misstatements in the area of revenue recognition. In particular: (i) no controls requiring customer approval for early shipments outside of agreed upon shipping terms; (ii) no controls requiring centralized retention of proof of customer approval or request related to shipping outside of agreed terms; (iii) no formal process for offering or approving discounts to customers for early shipments; and (iv) no formal controls to ensure appropriate cut-off of direct revenue to customers at period ends in line with shipping terms.

Deficiencies in control activities contributed to material accounting errors identified and corrected in 2018 and prior years. These design deficiencies in control activities contributed to the potential for there to have been material accounting errors in substantially all financial statement account balances and disclosures.

204. The 2018 Amended 10-K also identified deficiencies in the Company's risk assessment and monitoring activities. Specifically, the report stated, in relevant part:

We did not design and implement an effective risk assessment based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the risk assessment component of the COSO framework. Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) identifying, assessing, and communicating appropriate objectives; (ii) identifying and analyzing risks to achieve these objectives; (iii) considering the potential for fraud in assessing risks; and (iv) identifying and assessing changes in the business that could impact our system of internal controls.

***A contributing factor to material weaknesses in the risk assessment included the fact that the Company's formal SOX compliance program did not have sufficient scope and focus on the key financial reporting risks.***

\*        \*        \*

We did not design and implement effective monitoring activities based on the criteria established in the COSO framework. We have identified deficiencies in the principles associated with the monitoring component of the COSO framework. Specifically, these control deficiencies constitute material weaknesses, either individually or in the aggregate, relating to: (i) selecting, developing, and performing ongoing evaluation to ascertain whether the components of internal controls are present and functioning; and (ii) evaluating and communicating internal control deficiencies in a timely manner to those parties responsible for taking corrective action.

***The following were contributing factors to the material weaknesses in monitoring activities:***

- Management did not properly evaluate the function and operating effectiveness of certain internal control activities, limiting its ability to detect and communicate deficiencies.
- Internal audit activities were insufficient to keep pace with the size and complexity of our business structure and organization, which limited our ability to effectively monitor internal controls.

- The Company's formal SOX compliance program did not have sufficient scope and focus on the key financial reporting risks.
- The Company did not have sufficient talent and resources with sufficient expertise to evaluate the risks and controls.
- The Company did not have sufficient oversight and supervision of the internal control evaluation process.

205. Also on June 8, 2020, RTI filed its annual report on Form 10-K for the period ended December 31, 2019 (the "2019 10-K"). With respect to the errors in the quarterly financial statements issued in fiscal 2019, the 2019 10-K summarized:

a. <u>Revenue</u> – As noted above, the Company has concluded that in some instances revenue for certain invoices should have been recognized at a later date than when originally recognized. The Company identified revenue from certain customer orders that were shipped early to customers without obtaining authorized approval, and thus was recognized in an incorrect period. There were also instances in which the Company could not locate evidence that the OEM customers had requested or approved the shipments and therefore concluded revenue related to these shipments were an error. Correction of these errors, when including the rollover effect from the immediately preceding periods, increased revenue by $0.3 million in the quarter ended March 31, 2019, decreased by $0.8 million in the quarter ended June 30, 2019 and increased by $0.6 million in the quarter ended September 30, 2019.

b. <u>Costs of processing and distribution</u> – Based on the corrections to the above revenue errors, when including the rollover effect from the immediately preceding periods, costs of processing and distribution increased by $0.1 million in the quarter ended March 31, 2019, decreased by $0.2 million in the quarter ended June 30, 2019 and increased by $0.1 million in the quarter ended September 30, 2019.

c. <u>Accounts receivable</u> – As a result of the errors corrections above, accounts receivable increased by $0.4 million in the quarter ended March 31, 2019, decreased by $0.3 million in the quarter ended June 30, 2019 and increased $0.3 million in the quarter ended September 30, 2019.

d. <u>Inventories, net</u> – As a result of the errors corrections above, net inventories decreased by $0.1 million in the quarter ended March 31, 2019, increased by $0.1 million in the quarter ended June 30, 2019 and increased by less than $0.1 million in the quarter ended September 30, 2019.

e. <u>Deferred tax assets</u> – As a result of the income tax impact of the errors corrections above, deferred tax assets decreased by $0.6 million in the quarter ended March 31, 2019, decreased by $0.5 million in the quarter ended June 30, 2019, and decreased by $0.6 million in the quarter ended September 30, 2019.

206.    In addition to the errors identified in the 2018 Amended 10-K, the 2019 10-K stated that "[a]dditional errors were made in connection with the recording of the acquisition of Paradigm Spine, LLC in 2019."  Specifically, the report stated:

The following errors in the Company's quarterly financial statements were identified and corrected apart from the Investigation and related to accounting for our 2019 acquisition of Paradigm Spine, LLC for the first three quarters of 2019. ASC 805 *Business Combinations* states that if the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the acquirer shall report in its financial statements the provisional amounts for the items for which the accounting is incomplete. The acquisition occurred on March 8, 2019, before the end of the first quarter of 2019. Accordingly, based on the information known or knowable in the first quarter of 2019, the Company should have performed a preliminary allocation of the purchase price to assets acquired and liabilities assumed. The Company did not appropriately prepare a preliminary estimates of the purchase price allocation resulting in errors impacting intangible assets, acquisition contingencies, inventory, and goodwill. The correction of the errors related to accounting for the acquisition of Paradigm Spine, LLC are as follows:

a. Costs of processing and distribution – Based on the corrections to the inventory valuation and Paradigm purchase accounting, costs of processing and distribution increased by $0.3 million in the quarter ended March 31, 2019, decreased by $1.9 million in the quarter ended June 30, 2019, and by $1.2 million in the quarter ended September 30, 2019.

b. Marketing, general and administrative – Based on the corrections to the amortization related to the other intangible assets' valuation and Paradigm purchase accounting, marketing, general and administrative expenses increased by $0.7 million in the quarter ended March 31, 2019 and increased $2.1 million in each of the quarters ended June 30, and September 30, 2019.

c. Current inventories, net – Based on the corrections to the inventory valuation and Paradigm purchase accounting, net current inventories increased by $1.2 million in quarter ended March 31, 2019, and decreased by $12.6 million in the quarters ended June 30, and September 30, 2019.

d. Non-current inventories, net – Based on the corrections to the inventory valuation and Paradigm purchase accounting, net non-current inventories increased by $10.3 million in quarter ended March 31, 2019, decreased $11.2 million in the quarter ended June 30, 2019, and decreased by $10.0 million in the quarter ended September 30, 2019.

e. <u>Deferred tax assets</u> – Based on the corrections to the Paradigm purchase accounting deferred tax assets increased by $0.2 million in quarter ended March 31, 2019, increased by $0.3 million in the quarter ended June 30, 2019, and increased by $0.5 million in the quarter ended September 30, 2019.

f. <u>Goodwill</u> – Based on the corrections to the Paradigm purchase accounting, goodwill decreased by $113.5 million in quarter ended March 31, 2019, decreased $76.4 million in the quarter ended June 30, 2019, and decreased by $41.7 million in the quarter ended September 30, 2019.

g. <u>Other intangible assets - net</u> – Based on the corrections to the Paradigm purchase accounting, net other intangible assets increased by $78.3 million in the quarter ended March 31, 2019, increased $76.2 million in the quarter ended June 30, 2019, and increased $74.1 million in the quarter ended September 30, 2019.

h. <u>Acquisition contingencies</u> – Based on the corrections to the contingent liability valuation and Paradigm purchase accounting, acquisition contingencies decreased by $22.8 million in each of the quarters ended March 31, and June 30, 2019 and increased $11.9 million in the quarter ended September 30, 2019.

207.    The 2019 10-K also identified certain "immaterial corrections in all periods presented."  Specifically, it summarized:

a. <u>Marketing, general and administrative</u> – The Company corrected certain errors which decreased marketing, general and administrative expenses by $0.5 million in the quarter ended March 31, 2019 and less than $0.1 million in each of the quarters ended June 30, and September 30, 2019.

b. <u>Accounts receivable</u> – The Company corrected certain errors which decreased accounts receivable by $0.4 million for the quarter ended March 31, 2019, and by $0.3 million for the quarters ended June 30, and September 30, 2019.

c. <u>Prepaid and other current assets</u> – The Company corrected certain errors which decreased prepaid and other current assets by $0.5 million for each of the quarters ended March 31, and June 30, 2019, and September 30, 2019.

d. <u>Deferred tax assets - net</u> – The Company corrected certain errors which increased net deferred tax assets by $0.7 million for the quarters ended March 31, June 30, and September 30, 2019.

e. <u>Property, plant & equipment</u> – The Company corrected certain errors which increased property, plant & equipment by $0.3 million for the quarters ended March 31, June 30, and September 30, 2019.

f. Other intangible assets - net – The Company corrected certain errors which decreased net other intangible assets by $0.8 million for each of the quarters ended March 31, June 30, and September 30, 2019.

g. Other assets - net – The Company corrected certain errors which decreased net other assets by $0.3 million for the quarters ended March 31, June 30, and September 30, 2019.

h. Accounts payable – The Company corrected certain errors which decreased accounts payable by $0.2 million for the quarters ended March 31, June 30, and September 30, 2019.

i. Accrued expenses – The Company corrected certain errors which increased accrued expenses by $0.6 million for the quarters ended March 31, June 30, and September 30, 2019.

j. Payments for treasury stock – The Company corrected certain errors which reclassified operating cash flows to financing cash flows for purchases of treasury stock by $0.1 million, $0.2 million, and $0.2 million for the quarters ended March 31, June 30, and September 30, 2019, respectively.

208.    The 2019 10-K stated that RTI's "disclosure controls and procedures were not effective as of December 31, 2019 because of certain material weaknesses in [its] internal control over financial reporting" substantially similar to those identified in the 2018 Amended 10-K.  The report also stated that "[r]emediation of the identified material weaknesses and strengthening [the Company's] internal control environment will require a substantial effort throughout 2020 and beyond, as necessary."

209.    As a direct result of the restatement, RTI and Montagu amended the purchase agreement, reducing the purchase price by approximately $40 million and eliminating the RTI's ownership stake in the go-forward OEM business, which was worth approximately $10 million.

210.    On June 29, 2020, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2020, stating:

Based on the results of the Investigation, the Company concluded *that revenue for certain invoices should have been recognized at a later date than when originally recognized.* In response to binding purchase orders from certain OEM customers,

***goods were shipped and received by the customers before requested delivery dates and agreed-upon delivery windows.*** In many instances the OEM customers requested or approved the early shipments, ***but the Company determined that on other occasions the goods were delivered early without obtaining the customers' affirmative approval. Some of those unapproved shipments were shipped by employees in order to generate additional revenue and resulted in shipments being pulled from a future quarter into an earlier quarter.***

211.    On March 16, 2021,  RTI filed its annual report for fiscal year 2020, admitting that the material weaknesses leading to the restatement had not been remediated.  According to the report "[r]emediation of the identified material weaknesses and strengthening our internal control environment will require a substantial effort throughout 2021."

3.    ██████████████████████████████████████
      █████

212.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████

213.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████  ████████████████████████  ████
████████████████████████████████████

214.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████

████████████

215. ██████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

216. ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ ████████████████████

███████████████████████████████████████████

███████████████ █████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

217. ██████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

218. ██████████████████████████████████

████████████████████ ██████████████████ ██████

███████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████

219. █████████████████████████████████████████████

████████████████████████████    ██████████████████████    █████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

220. █████████████████████████████████████████████

████████████████████████████    ██████████████████████    █████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

221. █████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████    █████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████

222. █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

223. █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

224. █████████████████████████████████████

██████████████████████████ ██████████████████ ███

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

225. █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████

226. █████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████

     227. ████████████████████████████

█████████ ███████████████████████ █████

███████████████████████████████████████

███████████████████████████████████████

██████████████

     228. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

     229. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

230. ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ ██████████████████████

██████████████████

231. ████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

232. ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

233. ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

234. ████████████████████████████████████████

██████████████████████████████████████ █████████████

██████████████████████████████████████████

235. ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████

236. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ ██████████████████
████████

237. ████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████ ████████████████
███████████████████████████████████████

238. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

239. ████████████████████████████████████████
████████████████████████████████████████████



240.

E.     **The Director Defendants Caused the Company to Expend Significant Funds to Repurchase Its Stock**

241.     The Director Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.  In total, RTI spent an aggregate amount of over $4.5 million to repurchase approximately 1,006,318 shares of its own common stock at artificially inflated prices from August 2016 through March 2019.

242.     According to the 2016 10-K, during August 2016, the Company purchased 109,506 shares of its common stock for approximately $362,464 at an average price of $3.31 per share.  As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by $105,125 for stock repurchases during this period.

243.     According to the 2017 10-K, during January, February, and November 2017, the Company purchased 745,122 shares of its common stock for approximately $3.4 million at an average price of $4.65 per share.  As the Company's stock was actually worth only $2.35 per share,

the price at closing on March 17, 2020, the Company overpaid by nearly $1.7 million for stock repurchases during this period.

244.    According to the 2018 10-K, during the months of January, April, May, July, and August 2018, the Company purchased 107,109 shares of its common stock for approximately $478,591 at an average price of $4.47 per share.  As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $226,885 for stock repurchases during this period.

245.    According to the 1Q19 10-Q, during the quarter ended March 31, 2019, the Company purchased 29,021 shares of its common stock for approximately $136,435 at an average price of $4.70 per share.  As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by about $68,199 for stock repurchases during this period.

246.    According to the 2Q19 10-Q, during the quarter ended June 30, 2019, the Company purchased 7,748 shares of its common stock for approximately $38,032 at an average price of $4.94 per share.  As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by $19,825 for stock repurchases during this period.

247.    According to the 3Q19 10-Q, during the quarter ended September 30, 2019, the Company purchased 7,812 shares of its common stock for approximately $31,908 at an average price of $4.11 per share.  As the Company's stock was actually worth only $2.35 per share, the price at closing on March 17, 2020, the Company overpaid by approximately $13,550 for stock repurchases during this period.

248.    In sum, the Company overpaid for repurchases of its own stock by over $2.1 million.

### F.    Defendant Singer Sold Nearly $45,000 in RTI Stock While in Possession of Material Non-Public Information

249.    Singer is the Company's CFO with a highly sophisticated understanding of the Company's results and their import.

250.    As set forth herein, defendant Singer possessed material negative information which he knew was being concealed from investors.  Defendant Singer consciously acted to exploit his knowledge by selling nearly $45,000 of RTI stock to his substantial benefit, as follows:

| Date | Shares Sold | Price | Proceeds |
|------|-------------|-------|----------|
| 2/26/2020 | 5,940 | $4.05 | $24,057 |
| 2/28/2020 | 5,510 | $3.70 | $20,387 |

251.    Singer thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

### G.    The Motion to Dismiss in the Securities Class Action Was Denied

252.    On April 1, 2021, Judge Kennelly denied Defendants' motion to dismiss the Securities Class Action, finding that a securities fraud claim had been alleged.  As to the falsity of prior statements, Judge Kennelly found:

> The Court concludes Yeretsian has adequately alleged that the defendants made material misstatements. She alleges that RTI and its management report inaccurate financial results to the SEC for at least five consecutive years; RTI's filings violated GAAP requirements; RTI was subject to an investigation by the SEC as well as an internal audit committee for its erroneous revenue recognition practices in the OEM business and ineffective internal controls; RTI's improper activities led it to resubmit five years' worth of financial reports. A company's restatement of previously reported financial results is likely enough by itself to show materiality. The reason for this is that under GAAP, previously-issued financial statements should be restated only to correct material accounting errors.

253.    As to the officers' awareness of the falsity of the statements (*i.e.*, the scienter element of the securities fraud claim), Judge Kennelly found:

> In reviewing the amended complaint, the Court finds that Yeretsian has included specific factual allegations plausibly implicating RTI's management—namely the individual defendants—as the key personnel responsible for designing and maintaining RTI's internal controls; these same individuals later acknowledged RTI's internal control deficiencies. Yeretsian has also alleged specific facts plausibly indicating that at least some of the individual defendants *directed account managers to ship products early (or were aware of and condoned this practice)* and that each defendant signed SEC filings attesting to the accuracy of RTI's financial reports even though those reports were erroneous.

(citations omitted).

254.    Therefore, it is now a virtual certainty that RTI will face a substantial likelihood of liability in the Securities Class Action.

## VI.    DAMAGES TO THE COMPANY

255.    As a direct and proximate result of the Individual Defendants' conduct, RTI has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a)  Costs incurred in connection with the SEC's investigation;

b)  Funds expended in connection with the stock repurchases;

c)  The price reduction for the sale of the Company's OEM business;

d)  Fees for legal and professional fees incurred in connection with the Securities Class Action;

e)  Any funds paid to settle the Securities Class Action;  and

f)  Costs incurred from compensation and benefits paid to the defendants who have breached their duties to RTI.

256.    In addition, RTI's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

257.    The actions complained of herein have irreparably damaged RTI's corporate image and goodwill.  For at least the foreseeable future, RTI will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that RTI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

258.    Plaintiffs bring this action derivatively in the right and for the benefit of RTI to redress injuries suffered, and to be suffered, by RTI as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, violations of Section 10(b) and 14(a) of the Exchange Act, waste of corporate assets, and unjust enrichment.  RTI is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

259.    Plaintiffs will adequately and fairly represent the interests of RTI in enforcing and prosecuting its rights.

260.    Plaintiffs have continuously been a shareholder of RTI at times relevant to the wrongdoing complained of and is a current RTI shareholder.

261.    When this action was filed,[2] RTI's Board of Directors consisted of Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis and non-party directors Lightcap and Simpson.  Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Farhat**

_____

[2] The lead case in this consolidated action was filed on June 5, 2020.

262.     Farhat served as RTI's CEO when this action was filed, and therefore is not independent under NASDAQ listing rules.  As an employee, Farhat derives substantially all of his income from his employment with RTI, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Farhat personally issued the misleading statements alleged herein.  As a result, Farhat would be interested in a demand regarding his own wrongdoing, and demand is futile as to him.

**Defendants McEachin, Stolper, and Weis**

263.     McEachin, Stolper, and Weis served as the members of the Audit Committee at all relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, McEachin, Stolper, and Weis reviewed and approved the disclosures regarding the Company's financial statements, including with respect to revenue recognition for OEM customers.  As alleged herein, McEachin, Stolper, and Weis failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in RTI's SEC filings and other disclosures.  Thus, McEachin, Stolper, and Weis breached their fiduciary duties and are not disinterested, and demand is excused as to them.

264.     ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[████████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[██████████]

265. [████████████████████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[████████████████] [████████████████]

[████████████████████████████████████]

[████████████████████████████████████]

[██████████████]

266.    For these reasons, demand is excused as to McEachin, Stolper, and Weis because they face a substantial likelihood of liability for their utter failure to implement any reporting or information system or controls related to revenue recognition, and their failure to exercise even a modicum of oversight over same.

**Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis**

267.    Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis each are responsible for the issuance of the misleading disclosures and omissions in the Form 10-Ks for fiscal years 2015, 2016, 2017, and 2018, having signed and issued the 10-Ks.  When Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis signed the Form 10-Ks, they knew that the Company had improperly recognized revenue with respect to OEM customers.  By

intentionally issuing disclosures that misrepresented the Company's results, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis breached their fiduciary duties and face a substantial likelihood of liability.

268. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

269. Additionally, demand is excused as to Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis in connection with the insider selling of Singer. The material negative non-public information known to Singer when he sold his stock is the same information as was known to Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis when they signed and issued the Form 10-Ks. Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis could not disinterestedly investigate allegations that Singer traded on non-public information because they are alleged to have concealed the same information, and finding that Singer had trading on such information would be admitting that indeed the information had been concealed, and was known by the Board and management when they issued

the Form 10-Ks. As a result, demand is excused in connection with the *Brophy* claim alleged herein.

270. Moreover, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis were directors at the time of the stock repurchases alleged herein and voted to conduct the stock repurchase. These Defendants therefore by their intentional acts caused the Company to be harmed by over $2.1 million. Having failed to make any good faith effort to oversee the Company's controls related to revenue recognition, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis were not adequately informed regarding the reliability of the Company's reported financial statements when they voted to cause RTI to purchase its own stock. Their vote was therefore not a valid exercise of business judgment. They could not disinterestedly consider a demand for action or investigate their votes without being required to evaluate and make a decision on such topics as their states of mind and whether there was a reason to doubt they acted with business judgement. This they could not do disinterestedly and independently, and thus demand is excused.

271. Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in 2018. These eight directors issued the proxy statement knowing that representations made in the Company's SEC filings and other disclosures were misleading with respect to the Company's revenue recognition, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in 2018. Had these eight directors truthfully and completely revealed the misleading nature of the Company's public statements, Farhat, Gearen, McEachin, Stolper, Thomas, Valeriani, and Weis would not have been reelected as directors and the 2018 Plan would not have been approved. As a result Farhat, McEachin, Selquist, Stolper,

Sweeney, Thomas, Valeriani, and Weis would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

**COUNT I**

**Against All Defendants for Breach of Fiduciary Duty**

272.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

273.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RTI's business and affairs, particularly with respect to issues as fundamental as public disclosures.

274.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RTI.

275.    In breach of their fiduciary duties owed to RTI, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

276.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

277.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RTI has sustained and continues to sustain significant damages.  Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against Singer – *Brophy* Claim

278.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

279.    As alleged herein, Singer is a fiduciary of RTI, possessed material, non-public information of RTI, and used that information improperly to profit from sales of RTI stock. When Singer directed the stock sales set forth above, he was motivated to do so, in whole or in part, by the substance of the material, non-public information he possessed and he acted with scienter.

280.    When Singer sold his RTI stock, he knew that the investing public was unaware of the negative material information that he possessed.  He also knew that if the information were disclosed, the market price of RTI stock would be significantly lower.  Singer timed his stock sale to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock he sold.  He thereby benefitted by misappropriating RTI's non-public information.

281.    Plaintiffs have no adequate remedy at law.

## COUNT III
### Against Farhat, Hutchison, Singer, Jordheim, and Louw for Contribution
### For Violations of Sections 10(b) and 21D of the Exchange Act

282.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

283.    Farhat, Hutchison, Singer, Jordheim, and Louw are named as Defendants in the related Securities Class Action.  The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

284.    RTI is named as a defendant in related securities class actions that allege and assert claims arising under § 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If RTI is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

285.    As officers, directors and otherwise, Farhat, Hutchison, Singer, Jordheim, and Louw had the power or ability to, and did, control or influence, either directly or indirectly, RTI's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

286.    Farhat, Hutchison, Singer, Jordheim, and Louw are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

287.    Farhat, Hutchison, Singer, Jordheim, and Louw have damaged the Company and are liable to the Company for contribution.

288.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT IV

**Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Defendants Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis**

289.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

290.    This Count is asserted on behalf of the Company against Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

291.    At all relevant times, in connection with RTI's repurchases of its shares, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis made, disseminated, or approved false or misleading statements about the Company specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis's course of conduct were designed to artificially inflate the price of the Company's common stock.

292.    At the same time that the price of the Company's common stock was inflated due to the false and misleading statements, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis caused the Company to repurchase over a million shares of its own stock at prices that were artificially inflated due to their false or misleading statements.  Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis engaged in a scheme to defraud the Company by causing it to repurchase its shares at inflated prices.

293.    Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices,

schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of RTI common stock at all relevant times.

294. Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of RTI common stock, which were intended to, and did deceive the Company regarding its performance and the effectiveness of its internal controls.

295. Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis were directors and senior management and of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made at all relevant times, as alleged above.

296. As described above, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis acted with scienter at all relevant times, in that he acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of

material facts set forth herein were either known to Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis or were so that they should have been aware of them.

297.   As a result of Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis's misconduct, RTI has suffered damages in that it paid artificially inflated prices for RTI common stock as part of the repurchase program and suffered losses when the true facts became known.  The Company would not have purchased RTI common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the false or misleading statements made by Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis.

298.   As a direct and proximate result of Farhat's, McEachin's, Selquist's, Stolper's, Sweeney's, Thomas's, Valeriani's, and Weis's wrongful conduct, the Company suffered damages in connection with its repurchases of RTI common stock during the relevant period.  By reason of such conduct, Farhat, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

299.   Plaintiffs brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT V

**Against Defendants Farhat, Gearen, McEachin, Selquist, Stolper, Sweeney, Thomas, Valeriani, and Weis for Violation of Section 14 of the Exchange Act**

300.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

301.   Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein

not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's proxy statement filed on March 26, 2018 violated § 14(a) and Rule 14a-9 because: (i) it misrepresented the actual activities of the Board, as well as the Audit Committee, with respect to risk management and oversight while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (ii) it failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.

302.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

303.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited shareholder votes for: (i) director nominees; (ii) the 2018 Plan; and (iii) executive compensation. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

304.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT VI

### Against the Individual Defendants for Waste of Corporate Assets

305.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

306.    The Individual Defendants breached their fiduciary duties and, thereby, caused RTI to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

307.     As a direct and proximate result of these breaches of their fiduciary duties, RTI has sustained and will continue to sustain significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT VII

### Against All Defendants for Unjust Enrichment

308.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

309.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of RTI.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to RTI.

310.     Plaintiffs, as stockholders and representatives of RTI, seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

311.     Plaintiffs, on behalf of RTI, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of RTI, demand judgment as follows:

A.     Declaring that Plaintiffs may maintain this action on behalf of RTI and that Plaintiffs are adequate representatives of the Company;

B.     Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that the Individual Defendants have breached their fiduciary duties to RTI;

D.      Directing RTI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect RTI and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen RTI's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of RTI to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of RTI have an effective remedy;

F.      Awarding to RTI restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.  Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: June 1, 2021

By: /s/*Benjamin I. Sachs-Michaels*

**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston (admitted *pro hac vice*)
Benjamin I. Sachs-Michaels (admitted *pro hac vice*)
712 Fifth Avenue, 31st Floor
New York, NY 10019
(212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
(310) 201-9150
E-mail: rprongay@glancylaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (admitted *pro hac vice*)
240 Townsend Square
Oyster Bay, NY 11771
(516) 992-5427
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
Carl V. Malmstrom
111 W. Jackson St., Suite 1700
Chicago, IL 60604
(312) 984-0000
Email: malmstrom@whafh.com

**MILLER LAW LLC**

Andrew Szot
Marvin A. Miller
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400
Email: mmiller@millerlawllc.com

*Co-Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Email: pkim@rosenlegal.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
(310) 914-5007
Email: fcruz@frankcruzlaw.com

*Additional Counsel for Plaintiffs*